**DIGITAL TECHNOLOGIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 08–604C.

United States Court of Federal Claims.

Filed: Dec. 4, 2009.

Reissued for Publication Dec. 9, 2009.[1]

---

**1.** This opinion was issued under seal on December 4, 2009. The parties were given the opportunity to propose material for redaction. No redactions were proposed, and the original opinion is hereby unsealed and reissued without redactions.

Daniel J. Kelly, McCarter & English, LLP, Boston, Massachusetts, for the plaintiff. Of counsel, Gary J. Campbell and Bonnie A. Vanzler, McCarter & English, LLP, Boston, Massachusetts.

Gregg M. Schwind, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Kirk Manhardt, Assistant Director, and Jeanne E. Davidson, Director, Commercial Litigation Branch, and Gregory G. Katsas, Assistant Attorney General, Civil Division. Of counsel, Paul B. Oman and John Sabatino, Office of the Chief Counsel, United States Customs and Border Protection, Washington, D.C.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Alleging a breach of contract, plaintiff Digital Technologies, Inc. (DTI), seeks damages for breach of a fair opportunity to compete clause under its multiple-award, Indefinite Delivery/Indefinite Quantity (ID/IQ) contract with United States Customs and Border Protection (Customs) of the United States Department of Homeland Security. The alleged breach of contract is based on

the award of a task order to DTI's competitor, Automation Technologies, Inc. (ATI), on November 30, 2006.[2] Defendant has filed a motion to dismiss, arguing that the true nature of the plaintiff's claim is not a breach of contract dispute, which is the plaintiff's characterization of the claim, but rather, a post-award protest of a task order issued under a multiple-award, ID/IQ contract. With certain exceptions not applicable here, a task order is not subject to protest, pursuant to the prohibition in the Federal Acquisition Streamlining Act of 1994 (FASA), Pub.L. No. 103–355, Title I, § 1054, 108 Stat. 3264 (1994) (codified as amended at 41 U.S.C. § 253j(d) (2006)).[3]

In January 2006, Customs awarded ATI a competitively bid, sole-source contract to provide computer hardware maintenance at a Customs facility in Springfield, Virginia. As an ID/IQ contract, the agreement entailed Customs issuing work orders for any required services during the term of the contract, with Customs bound to order and ATI bound to provide a certain minimum amount of work. *See* 48 C.F.R. § 16.504 (2006) (titled "Indefinite-quantity contracts," and setting forth the elements of an ID/IQ contract). In the present case, ATI's contract set a guaranteed minimum of $2,500.00 and a ceiling of $9,900,000.00 for the base year ending December 31, 2006, and for each of four one-year, extension options. Plaintiff DTI, an unsuccessful competitor for the contract, protested the January 2006 award at the GAO. Customs overrode the automatic stay that had gone into effect when the GAO protest was filed[4] and, from January through October 2006, Customs issued a number of task orders to ATI totaling nearly $7.9 million. When the GAO stated in March 2006, in an Outcome Prediction Alternative Dispute Resolution conference, that it appeared Customs had engaged in improper discussions with ATI, Customs took corrective action by amending the solicitation and reopening bidding on the procurement. The GAO subsequently dismissed the protest. *See Digital Techs., Inc.,* Comp. Gen. B–297851 (Mar. 23, 2006).

On July 26, 2006, Customs awarded an ID/IQ contract to DTI, with terms similar to ATI's contract, covering the same services, but with a base period of September 1, 2006, to April 30, 2007, and four one-year options. When ATI protested the award before the GAO, Customs overrode the automatic stay, reasoning that ATI would likely lose the protest and that the override would lead to cost savings that made the override in the best interests of the government. *See Automation Techs., Inc. v. United States,* 72 Fed. Cl. 723, 725–26 (2006) (*ATI I*). ATI challenged the override before this court, which found the override decision to be "unreasonable, arbitrary and capricious and invalid." *Id.* at 731. After the initial override, Customs had issued a two-month task order to DTI for maintenance, to begin September 1, 2006, but following the court's decision in *ATI I*, the stay on DTI's contract was reinstated pending the GAO decision. Given the stay, Customs cancelled DTI's task order on August 31, 2006, the day before it was to go into effect, and issued a three-month task

---

**2.** Two earlier, separate, but related cases before the undersigned judge concerning DTI, ATI, and the multiple-award contracts awarded to each contractor in 2006 are found at *Automation Technologies, Inc. v. United States,* 72 Fed.Cl. 723 (2006) (*ATI I*), and *Automation Technologies, Inc. v. United States,* 73 Fed.Cl. 617 (2006) (*ATI II*); *see also* related Government Accountability Office (GAO) protests, chronologically: *Digital Techs., Inc.,* Comp. Gen. B–297851 (Mar. 23, 2006); *Automation Techs., Inc.,* Comp. Gen. B–298618, B–298618.2 (Sept. 6, 2006); *Automation Techs., Inc.,* Comp. Gen. B–298618.3 (Oct. 4, 2006); *Digital Techs., Inc.,* Comp. Gen. B–298618.4 (Jan. 11, 2007); and *Digital Techs., Inc.,* Comp. Gen. B–298618.5 (Feb. 23, 2007). None of these earlier cases address the current issues before the court.

**3.** A 2008 amendment redesignated this subsection as 41 U.S.C. § 253j(e) and added another exception not applicable here (that a protest may be brought of a task order award in excess of $10 million). Pub.L. 110–181, § 843(b)(2)(A). The pre–2008 designation of the subsection is used here because it reflects the version of the statute in effect at the time of the present dispute.

**4.** The provisions at 31 U.S.C. § 3553(d)(3)(A) (2006) mandate an automatic stay upon the filing of a bid protest with the GAO, and 31 U.S.C. § 3553(d)(3)(C) provides authority to override a stay in specific circumstances.

order to ATI as a stop-gap measure to ensure the availability of services. When the GAO ultimately dismissed ATI's protest and denied reconsideration, Customs modified the task order then held by ATI, changing the end date from November 30, 2006, to October 31, 2006. *See Automation Techs., Inc.,* Comp. Gen. B–298618.3 (Oct. 4, 2006); *Automation Techs., Inc.,* Comp. Gen. B–298618, B–291618.2 (Sept. 6, 2006). ATI subsequently filed suit in this court challenging the merits of the award to DTI.

Agreeing with the reasoning of the GAO decision, this court found that ATI lacked standing because, as the holder of a valid contract covering the same services as DTI's contract, ATI was not prejudiced by the award of a contract to DTI inasmuch as resolicitation would not improve ATI's position. *Automation Techs., Inc. v. United States,* 73 Fed.Cl. 617, 623–24 (2006) *(ATI II ).* The court found that,

> [a]lthough not the original intention of Customs, under the unique facts and circumstances of this case, multiple contract awards effectively have been made to ATI and DTI.... Even the solicitation language, albeit somewhat unclearly, appeared to allow multiple awards and could be read to contemplate that possibility in the evaluation procedures.

*Id.* at 623.

ATI argued that if there were a multiple-award, ID/IQ scenario, then proper proce-

dures were not in place to ensure that it would be given a fair opportunity to be considered for future task orders, as guaranteed by 41 U.S.C. § 253j(b) (2006).[5] *ATI II,* 73 Fed.Cl. at 622–23. The court held that it was unable to entertain ATI's challenge "to the extent that ATI's actions are in the nature of a protest to future task orders under the terms of its contract...." *Id.* at 625 (citing *A & D Fire Protection, Inc. v. United States,* 72 Fed.Cl. 126, 133–34 (2006)).

On October 25, 2006, ATI submitted a protest to the Customs ombudsman. Given the finding in *ATI II* that Customs had effectively issued multiple-award contracts, ATI claimed that it had not been given a fair opportunity to compete for the task order issued to DTI. ATI requested that Customs modify both ATI's and DTI's contracts to account for the multiple-award scenario by including fair opportunity procedures. In response, Customs unilaterally modified both ATI's and DTI's contracts on October 27, 2006 (Modification P00001), identifying a task order ombudsman and incorporating by reference Federal Acquisition Regulation (FAR) 16.505(b)(1), which requires the government to follow certain fair opportunity procedures when soliciting task orders under a multiple-award, ID/IQ contract.[6] Customs described the modification as reflecting "administrative changes," which it is authorized to make unilaterally pursuant to FAR 43.103(b). On the same day as the fair opportunity procedures modification, October 27, 2006, Cus-

---

**5.** With a few exceptions, 41 U.S.C. § 253j(b) provides that, "[w]hen multiple contracts are awarded ..., all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts...." 41 U.S.C. § 253j(b).

**6.** In addition to identifying a task order ombudsman, the text of Modification P00001 stated as follows:

> Fair Opportunity Procedures (IAW FAR 16.505(b)(1))—
> a. Task orders will be issued such that one awardee will be performing tasks under the contract at any one time, for no less than one month per order.
> b. Issuance of the next task order will be on the basis of the best value to the government based on the revised proposals submitted by the awardees pursuant to the corrective action

taken in the protest of the first award of this contract, and in accordance with the dismissal of the protest in *Automation Technologies Inc. v. United States,* No. 06–694, 73 Fed.Cl. 617 (Fed.Cl.2006) *[ATI II ].* Because of the considerable information provided to the contracting officer through the corrective action and revised proposals in this matter, the contracting officer currently "has information available to ensure each awardee is provided a fair opportunity to be considered for each order" under FAR 16.505(b)(1)(ii).
> c. Subsequent task orders will be issued based on a determination of the best value to the government. Price, and past performance on earlier orders under the contract, will be the only factors considered, with price being the most significant consideration in awarding tasks, consistent with FAR 16.505(b)(1)(ii) and (iii).

toms issued to DTI a one-month task order totaling $669,244.30 for services to be performed during November 2006. This would be the only task order DTI received under its master contract, leading DTI to allege bad faith on the part of Customs.

On November 15, 2006, Customs issued a Request for Quotations (RFQ) to ATI and DTI for a ten-month task order and four one-year options, with bids due by November 27, 2006. The initial ten-month period of the task order ran from December 1, 2006 through September 30, 2007, thus extending beyond the base periods of both ATI's and DTI's master contracts, which ended December 31, 2006, and April 30, 2007, respectively.[7]

Prior to the issuance of the November 15, 2006 solicitation, ATI had complained to the agency ombudsman that the first modifica-

tion on fair opportunity procedures was inadequate. The FAR required that task order placement procedures be developed and included in the contract, whereas Modification P00001 had only incorporated FAR 16.505(b)(1) by reference, without including specific task order placement procedures. *See* 48 C.F.R. § 16.505(b)(1)(ii)(A), (D). At the suggestion of the ombudsman, Customs modified both ATI's and DTI's contracts on November 16, 2006, with a retroactive effective date on the modifications of October 27, 2006. Revising Modification P00001, Modification P00002 added "ORDER PLACEMENT PROCEURES (MULTIPLE AWARD)", defining "the process by which (a) Fair Opportunity to be Considered will be afforded; (b) Task Orders will be competed; (c) Criteria for Award of a Task Order; and (d) Task Orders will be awarded."[8] Cus-

---

7. Customs was not constrained in the competition by the contractual guarantee that it provide a minimum of $2,500.00 in task orders under both ATI's and DTI's contracts because ATI had been provided work in excess of the minimum, and DTI was issued a task order for services to be performed during November 2006 which also exceeded the minimum. *See* 41 U.S.C. § 253j(b)(4).

8. Modification P00002 stated, in part, as follows:

(a) Fair Opportunity for Consideration—
(1) General. One or more task orders may be issued during the ordering period of this contract. The Contracting Officer's (CO) decision to issue a task order to a particular contract holder shall be based on the criteria stated below. In accordance with FAR 16.505(b), the CO will give each contract holder a "fair opportunity to be considered" for each order in excess of $2,500 unless one of the conditions in 16.505(b)(2) applies. Procedures and selection factors to be considered for each task order providing for a "fair opportunity to be considered" are set forth in (a)(2) below.
(2) Procedures providing for a Fair Opportunity to be considered: The Government will provide all awardees a fair opportunity to be considered. This will be provided through the examination by the Government of existing information already in the possession of the Government or through request(s) for task order quotes. In the majority of cases, the Contracting Officer, in coordination with the COTR [contracting officer's technical representative], will be able to select the appropriate awardee based on the data (including awarded CLIN [contract line item number] pricing and the contractor's past performance on earlier or-

ders under the contract) already available to the Government. In other cases, the Government may contact any or all of the contract holders for submission of quotes.
(b) Task Order Competition Procedures—
(1) Request for Quote (RFQ) Contents: When contractor submission of quotes is necessary, the Government will issue an RFQ. Each RFQ will include the following information:
a) Date of the RFQ;
b) Identification of required CLIN quantities;
c) Pricing Format for submission of revised pricing;
d) Past Performance Scoring Sheet (for information only);
e) Performance period;
f) Due date for submission of quote; and
g) Information and submission instructions substantially as follows:

. . .

Generally, quotes responding to RFQ's will be due within seven (7) working days after the RFQ issue date.
(2) Task Order Evaluation/Selection Criteria. Upon receipt of the contractor's quote, the Government shall review the quote for completeness and acceptability. The determination of which contractor is awarded the task shall be based on a determination of the best value to the government. Price, and past performance on earlier orders under the contract, will be the only factors considered, with price being the most significant consideration in awarding tasks, consistent with FAR 16.505(b)(1)(ii) and (iii).
(3) Task orders will be issued such that one awardee will be performing tasks under the contract at any one time, for no less times than one month per order.

toms designated the second modification as reflecting "administrative changes," but, unlike the first modification, Customs noted on the cover sheet that this modification was to be made "By Mutual Agreement," and required the contractors' signatures. While ATI signed the modification, DTI did not.

Before submitting a bid on the November 15, 2006 Request for Quotations, DTI contested various aspects of the RFQ in three letters to the contracting officer and also "orally" with the ombudsman that, according to DTI, all went unaddressed. The RFQ had listed price and past performance under the master contract as the selection criteria for the award, with price being most significant. DTI complained to the contracting officer concerning the inclusion of past performance as a factor in the solicitation. Having encountered "clearance issues" that limited DTI's access to equipment in performing its November 2006 task order, DTI believed it had no "record of relevant past performance," and that Customs would be required to give it a neutral evaluation, citing FAR 15.305(a)(1)(iv). DTI also alleged that the equipment quantities in the RFQ were inaccurate, thus giving the more experienced ATI, which had provided ten months of service to Customs in 2006, a further unfair advantage in pricing proposals. DTI further objected to what it understood to be Customs' intention to use a ten-month task order, with options to extend for four years, as a means of avoiding competition.

On November 30, 2006, Customs awarded the ten-month task order to ATI. In a November 30, 2009 letter to DTI, notifying DTI of its non-selection, Customs reiterated that price was the most significant factor in the RFQ. ATI had lower bids for the base period and on all but one option period. Overall, ATI proposed a total price of $35,130,426.00 for the base period and four option periods, compared to DTI's higher proposed price of $36,781,512.82. In the same November 30, 2006 letter to DTI, Customs also noted it had awarded DTI 500 out of 600 possible points, for an 83.33% score, compared to ATI, which was awarded 600 out of 600 points, for a 100% score. Customs further noted that "[t]here was no adverse information associated with [DTI's] past performance under the contract." In September 2007, Customs exercised the first option to extend ATI's task order through September 2008.

After the award to ATI, DTI protested the award to the GAO. DTI alleged that the task order increased the duration [9] of the underlying contract, inaccurately stated Customs' requirements, and provided an incorrect basis for evaluating price proposals. *Digital Techs., Inc.,* Comp. Gen. B–298618.4 (Jan. 11, 2007). DTI also alleged that the task order was inappropriately used as a "downselection," that is, a vehicle used to change a multiple-award contract to a sole-source contract by a de facto elimination of all but one contractor. The GAO dismissed the protest as untimely. . *Digital Techs., Inc.,* Comp. Gen. B–298618.4 (Jan. 11, 2007). The GAO also denied DTI's request for reconsideration. *Digital Techs., Inc.,* Comp. Gen. B–298618.5 (Feb. 23, 2007).

On March 23, 2007, DTI wrote to the agency ombudsman, not to protest the award, but to request that Customs exercise the option to extend DTI's master contract beyond the base period. The ombudsman responded that she was without authority to review the agency's decision regarding the exercise of options. DTI's contract, therefore, was allowed to expire at the end of its base period, April 30, 2007. DTI filed a certified claim with the agency contracting officer, which was denied on August 30, 2007. DTI subsequently filed suit in this court.

DTI alleges in its complaint in this court abuse of discretion and bad faith on the part

---

(4) Contractors may "No Bid" any RFQ.
(c) Award of Task Order—

. . .

The Government's determination of the successful contractor for an individual task order is not subject to Protest under FAR Subpart 33.1. The debriefing requirements of FAR 15.506 are not applicable to orders issued un-

der this contract. However, the designated Ombudsman (required under FAR 16.505(b)(5)) is: [name, address, e-mail, and telephone and facsimile numbers omitted].

9. A task order that increases the scope, period, or maximum value of the underlying master contract is an exception permitting protest of the task order under FASA. *See* 41 U.S.C. § 253j(d).

of Customs (Count I). DTI also alleges breach of the following contractual duties: a fair opportunity to compete for task orders (Count II); a fair opportunity to be considered for additional work (Count III); the covenant of good faith and fair dealing (Count IV); the obligation to provide impartial, fair and equitable treatment to all contractors (Count V); and illegal, constructive termination (Count VI). More specifically, DTI reasserts the allegations made before the agency contracting officer. DTI alleges the following: Customs engaged in an improper auction through disclosure of DTI's unit pricing information; Customs' decision to compete the task order directly contradicted earlier assurances that it had no intention of competing work unless DTI, as the incumbent, had "severe performance difficulties"; Customs' descriptions of the scope of work of task orders being competed were inaccurate, although ATI had the advantage of knowing the correct scope of work; the short time frame for bidding on the November 2006 ten-month task order was designed with the intent of awarding the task order contract to ATI, whose master contract would prohibit it from receiving a task order after December 1, 2006; and the November 2006 task order solicitation was designed, in DTI's words, to "get rid of" DTI. In all, DTI claims, the agency actions were taken "maliciously, oppressively, and with the intent to injure," evincing a failure, in good faith, to provide a fair opportunity to compete for task orders, and that the agency, thereby, constructively terminated DTI's contract in bad faith. DTI seeks lost profits, and has attached to the complaint its certified claim to the agency in the amount of $9,377,985.10.

## DISCUSSION

■ DTI asserts jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), which grants the United States Court of Federal Claims jurisdiction over claims arising from express contracts, and the Contract Disputes Act (CDA), 41 U.S.C. § 609(a)(1) (2006). Defendant, however, argues that DTI's complaint is, in essence, a bid protest "thinly disguised" as a contract dispute. Defendant moves to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), arguing that DTI's complaint is in essence a bid protest of a task order on a multiple-award, ID/IQ contract, which protest is prohibited by 41 U.S.C. § 253j(d) ("A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order," with certain enumerated exceptions.). Defendant also moves to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). While defendant's motion does not, in every instance, specify which motion is asserted in response to which count of plaintiff's complaint, plaintiff, and the court, read defendant's motion as asserting an RCFC 12(b)(1) motion to dismiss in response to Counts I, II, and V, and an RCFC 12(b)(6) motion to dismiss in response to Counts I, IV, and VI. Defendant does not address Count III in its motion, aside from the general contention that all six counts fail to state a claim upon which relief can be granted because DTI is seeking lost profits. However, because of its close similarity to Count II (the fair opportunity to compete for task orders), the court effectively examines the jurisdictional issues raised by Count III (the fair opportunity to be considered for additional work) when it addresses Count II.

■ Jurisdiction is a threshold matter that must be resolved before proceeding to the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868))). In accordance with this court's rules, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). "Congress has the constitutional authority to define the jurisdiction of the lower federal courts, and, once the lines are drawn, 'limits upon federal jurisdiction ... must be neither disregarded nor evaded.'" *Keene Corp. v. United States*, 508 U.S.

200, 207, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (quoting *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)) (citation omitted). The Court of Federal Claims was "created by Congress as a forum where private parties could sue the government for money claims, other than those sounding in tort, where the claims would otherwise be barred by sovereign immunity." *Kanemoto v. Reno,* 41 F.3d 641, 644 (Fed.Cir.1994) (citation omitted). "[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)) (omission in original), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976). Furthermore, "it has been said, in a United States Court of Claims context, that a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *United States v. Testan,* 424 U.S. at 399, 96 S.Ct. 948 (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)); *see also Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied.") (citations omitted). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.*

"Subject matter jurisdiction may be challenged at any time by the parties, or by the court sua sponte." *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2004), *cert. denied,* 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); *see also Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338, 1346 (Fed.Cir.2008); *Fanning, Phillips, Molnar v. West,* 160 F.3d 717, 720 (Fed. Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (Fed.Cir.1993)); *United States v. Newport News Shipbuilding and Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991); *North Star Alaska Hous. Corp. v. United States,* 76 Fed. Cl. 158, 185, *appeal dismissed,* 226 Fed. Appx. 1004 (Fed.Cir.2007). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." *Special Devices, Inc. v. OEA, Inc.,* 269 F.3d 1340, 1342 (Fed. Cir.2001) (citing *Johannsen v. Pay Less Drug Stores N.W., Inc.,* 918 F.2d 160, 161 (Fed.Cir.1990)); *see also View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United Pac. Ins. Co. v. United States,* 464 F.3d 1325, 1327–28 (Fed.Cir.2006); *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed.Cir.1997)), *cert. denied,* 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000). "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint ... are challenged." *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999) (citing *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir. 1988)).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or

unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Greenlee County, Ariz. v. United States,* 487 F.3d 871, 875 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); *Palmer v. United States,* 168 F.3d 1310, 1314 (Fed. Cir.1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996).

Section 1491(a)(2) of the Tucker Act provides this court with jurisdiction over issues that arise under the CDA, including "any claim by or against, or dispute with a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract. . . ." 28 U.S.C. § 1491(a)(2). By its terms, the CDA gives this court jurisdiction to hear claims relating to "any express or implied contract . . . entered into by an executive agency for—. . . (2) the procurement of services[.]" 41 U.S.C. § 602(a)(2). Furthermore, the CDA provides that,

> in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1).

The issue raised by the case currently before the court is whether the court can adjudicate a claim alleging a failure of a statutory, regulatory and contractual obligation, to provide a fair opportunity to compete and be considered for task orders under a contract, in light of the Federal Acquisition Streamlining Act (FASA) provision, discussed below, prohibiting protests of task orders. DTI contends that defendant breached its contract with plaintiff because Customs did not provide a fair opportunity to compete for a ten-month task order issued in November 2006 or allow plaintiff to be considered for additional task orders after November 2006, although its contract with the government ran until April 30, 2007, with four, one-year options. In its motion to dismiss for lack of subject matter jurisdiction, defendant contends that DTI's complaint is essentially a "thinly disguised protest" of a task order, dressed as a breach of contract claim, as an "artifice" to "thwart the intent of Congress" and evade FASA's jurisdictional restriction on challenges to task order procurements and awards.

The Competition in Contracting Act (CICA) requires that procurements be conducted "in a manner designed to achieve full and open competition for the procurement[.]" 41 U.S.C. § 253a(a)(1)(A). In 1994, Congress passed FASA to simplify and streamline the federal acquisition process in order to yield a more efficient system. *See* S. Rep. 103–258, at 1, *reprinted in* 1994 U.S.C.C.A.N. 2561. "The Committee intends that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so." S. Rep. 103–258, at 15, 1994 U.S.C.C.A.N. 2561, 2576. FASA also "provides that when an agency makes an order pursuant to a task or delivery order contract, the agency is not required to publish a notice of solicitation nor is it required to hold a 'competition . . . that is separate from that used for entering into the contract.' " *Corel Corp. v. United States,* 165 F.Supp.2d 12, 20 (D.D.C.2001) (quoting 41 U.S.C.A. at § 253j(a)(2)) (omission in original); *see also Global Computer Enterprises, Inc. v. United States,* 88 Fed.Cl. 350, 404–05 (discussing the legislative history of FASA), *opinion modified on recons.* 88 Fed.Cl. 466 (2009) (addressing other matters). The report of the Senate Committee on Governmental Affairs explains:

The new provisions ... are intended to given [sic] agencies broad discretion in establishing procedures for the evaluation and award of individual task orders under multiple award contracts. They do not establish any specific time frames or procedural requirements for the issuance of task orders, other than that there be a specific statement of work and that all contractors under multiple award contracts be afforded a reasonable opportunity to be considered in the award of each task order (with narrow exceptions). Accordingly, contracting officials will have wide latitude and will not be constrained by CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order. When contracting officials award task orders they will have broad discretion as to the circumstances and ways for considering factors such as past performance, quality of deliverables, cost control, as well as price or cost.

S. Rep. 103–258, at 16, *reprinted in* 1994 U.S.C.C.A.N. 2561, 2576. "In other words, once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from CICA's full and open competition requirements." *Corel Corp. v. United States,* 165 F.Supp.2d at 20.

As noted above, FASA states that under a multiple-award, ID/IQ contract, "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 41 U.S.C. § 253j(d); [10] *see also Omega World Travel, Inc. v. United States,* 82 Fed.Cl. 452, 464 (Fed.Cl.2008) ("Challenges to a task order awarded under a master IDIQ contract are limited by FASA to allegations that the task order increases the 'scope, period, or maximum value of the contract under which the order is issued.' 41 U.S.C. § 253j(d). Accordingly, Omega's challenge of the task orders at issue in this case is limited to its allegations that the task orders exceed the scope of the ETS [E–Gov Travel Services] master IDIQ contract to include services not contemplated by the master IDIQ contract, and the court will consider the merits of this claim. All other allegations made by Omega challenging the award of the task orders are barred by FASA and may not be considered by this court.") (other citations omitted).

As a counterbalance to the streamlined procedures, FASA also established that each contract awardee eligible for the task orders issued, shall be provided a fair opportunity to be considered for task orders issued under a multiple-award, ID/IQ contract, with a few exceptions not applicable here.[11] 41 U.S.C. § 253j(b) ("When multiple contracts are awarded ..., all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts [unless one of the exceptions applies]."); *see also* 48 C.F.R. § 16.505(b)(1)(i) (2006). Furthermore, FASA requires agencies to designate a

---

**10.** The language quoted above reflects the version of the statute which was in effect at the time of the present dispute. As noted above, a later, 2008 amendment added a further exception, allowing protests of task orders in excess of $10 million. Pub.L. 110–181 § 843(b)(2)(C). The 2008 amendments also required enhanced competition requirements for task orders in excess of $5 million. Pub.L. 110–181 § 843(b)(2)(B). Because the pre–2008 version of FASA controls the dispute, these provisions do not apply.

**11.** (2) *Exceptions to the fair opportunity process.* The contracting officer shall give every awardee a fair opportunity to be considered for a delivery-order or task-order exceeding $3,000 unless one of the following statutory exceptions applies:

(i) The agency need for the supplies or services is so urgent that providing a fair opportunity would result in unacceptable delays.
(ii) Only one awardee is capable of providing the supplies or services required at the level of quality required because the supplies or services ordered are unique or highly specialized.
(iii) The order must be issued on a sole-source basis in the interest of economy and efficiency because it is a logical follow-on to an order already issued under the contract, provided that all awardees were given a fair opportunity to be considered for the original order.
(iv) It is necessary to place an order to satisfy a minimum guarantee.
48 C.F.R. § 16.505(b)(2) (2006); *see also* 41 U.S.C. § 253j(b)(1)-(4).

senior agency official independent from the contracting officer to serve as "a task and delivery order ombudsman who shall be responsible for reviewing complaints from the contractors on such contracts and ensuring that all of the contractors are afforded a fair opportunity to be considered for task or delivery orders when required under subsection (b) of this section." 41 U.S.C. § 253j(e).[12] In implementing FASA, the FAR gives the contracting officer broad discretion to establish task order placement procedures, yet it

also lists certain procedures that must be followed to provide a fair opportunity to each awardee, such as clearly stating the agency's requirements, and including the procedures in the solicitation and contract. *See* 48 C.F.R. §§ 16.505(a)(2), (b)(1)(ii)(D).[13]

Defendant contends that the restriction on protests contained in FASA, 41 U.S.C. § 253j(d), should divest this court of jurisdiction over the present case. The Tucker Act provides jurisdiction in this court over bid protests,[14] generally, when an interested par-

---

**12.** The 2008 amendments to FASA redesignated this subsection as 253j(f). Pub.L. 110–181, § 843(b)(2)(A). The amendment did not change the substance or text of this subsection. *Id.*

**13.** The 2006 version of the FAR was in effect at the time of the present dispute. The present version of FAR includes enhanced fair opportunity requirements for orders exceeding $5 million. *See* 48 C.F.R. § 16.505(b)(1)(iii) (2009). The version of FAR in effect during the dispute before the court provided as follows:

(1) *Fair opportunity.* (i) The contracting officer must provide each awardee a fair opportunity to be considered for each order exceeding $3,000 issued under multiple delivery-order contracts or multiple task-order contracts, except as provided for in paragraph (b)(2) of this section.

(ii) The contracting officer may exercise broad discretion in developing appropriate order placement procedures. The contracting officer should keep submission requirements to a minimum. Contracting officers may use streamlined procedures, including oral presentations. In addition, the contracting officer need not contact each of the multiple awardees under the contract before selecting an order awardee if the contracting officer has information available to ensure that each awardee is provided a fair opportunity to be considered for each order. The competition requirements in Part 6 and the policies in Subpart 15.3 do not apply to the ordering process. However, the contracting officer must—

(A) Develop placement procedures that will provide each awardee a fair opportunity to be considered for each order and that reflect the requirement and other aspects of the contracting environment;

(B) Not use any method (such as allocation or designation of any preferred awardee) that would not result in fair consideration being given to all awardees prior to placing each order;

(C) Tailor the procedures to each acquisition;

(D) Include the procedures in the solicitation and the contract; and

(E) Consider price or cost under each order as one of the factors in the selection decision.

(iii) The contracting officer should consider the following when developing the procedures:

(A)(*1*) Past performance on earlier orders under the contract, including quality, timeliness and cost control.

(*2*) Potential impact on other orders placed with the contractor.

(*3*) Minimum order requirements.

(*4*) The amount of time contractors need to make informed business decisions on whether to respond to potential orders.

(*5*) Whether contractors could be encouraged to respond to potential orders by outreach efforts to promote exchanges of information, such as—

(*i*) Seeking comments from two or more contractors on draft statements of work;

(*ii*) Using a multiphased approach when effort required to respond to a potential order may be resource intensive (*e.g.*, requirements are complex or need continued development), where all contractors are initially considered on price considerations (*e.g.*, rough estimates), and other considerations as appropriate (*e.g.*, proposed conceptual approach, past performance). The contractors most likely to submit the highest value solutions are then selected for one-on-one sessions with the Government to increase their understanding of the requirements, provide suggestions for refining requirements, and discuss risk reduction measures.

(B) Formal evaluation plans or scoring of quotes or offers are not required.

48 C.F.R. § 16.505(b)(1) (2006).

**14.** The FAR defines a protest, as follows:

*Protest* means a written objection by an interested party to any of the following:

(1) A solicitation or other request by an agency for offers for a contract for the procurement of property or services.

(2) The cancellation of the solicitation or other request.

(3) An award or proposed award of the contract.

(4) A termination or cancellation of an award of the contract, if the written objec-

ty[15] objects to a solicitation or contract award. 28 U.S.C. § 1491(b)(1).[16]

Plaintiff DTI responds that, by its terms, the restriction in FASA does not apply because DTI has asserted a breach of contract claim, not a bid protest. In its response to defendant's motion to dismiss, DTI contends that Customs' improprieties during the solicitation and award process constituted a breach of a contractual obligation to provide DTI a fair opportunity to be considered for work under the master ID/IQ contract it had been awarded by the government. Since the plain language of FASA refers to "protests," DTI argues that the court has jurisdiction over this case because DTI's dispute does not fit the description of a bid protest, but the description of a claim, addressed below. DTI insists that it "is not objecting to the award of any task order," nor is it "requesting injunctive relief" or "seeking to compel [Customs] to stay performance or to cancel [a] task order award."

In the present complaint, DTI claims it was denied a fair opportunity to compete under the contract it had been awarded, and to be considered for the work contemplated in DTI's contract, in that the government engaged in an improper auction through disclosure of DTI's unit pricing information; the government's decision to compete task orders directly contradicted earlier assurances that it would not compete the work unless DTI, as the incumbent, had "severe performance difficulties"; the government inaccurately described the scope of work of task orders being competed, adversely impacting DTI, while the correct scope of work was known to ATI; the short time frame for bidding on the November 2006 ten-month

task order was designed by the government with the intent of awarding the task order contract to ATI, whose master contract would have prohibited ATI from receiving an award after December 1, 2006; and the November 2006 task order solicitation was designed to deny work to DTI. DTI contends that these government actions were done "maliciously, oppressively, and with the intent to injure," reflecting a failure, in good faith, to provide a fair opportunity to compete for task orders, and resulting in a bad faith, constructive termination of DTI's contract.

By its terms, the FASA prohibition on bid protests does not apply to a breach of contract case. However, to hold that merely asserting jurisdiction or absence of jurisdiction under a particular statute avails the plaintiff of the jurisdictional reach of that statute, without examining whether jurisdiction was asserted appropriately, would be to elevate form over substance. *See Todd Constr., L.P. v. United States*, 85 Fed.Cl. 34, 43–44 (2008) ("[I]t seems exceedingly odd to decide whether a request for relief 'arises under' the contract by looking solely at the *type* of relief requested rather than the substance of the claim . . . .") (emphasis in original), *subsequent determination*, 88 Fed.Cl. 235 (2009) (addressing other matters). Therefore, the court must examine whether DTI's complaint properly qualifies as a breach of contract claim and, thereby, avoids the FASA prohibition on task order protests.

As the United States Court of Appeals for the Federal Circuit noted in *Reflectone v. Dalton*, 60 F.3d 1572, 1575 (Fed.Cir.1995) (en banc), "[b]ecause the CDA itself does not define the term 'claim,' we must assess

---

tion contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract. 48 C.F.R. § 33.101 (Definitions) (2009).

**15.** The United States Court of Appeals for the Federal Circuit has applied the CICA definition of "interested party" in bid protests to "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir.2001) (*AFGE*) (quoting 31 U.S.C. § 3551(2)),

*cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002); *see also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed.Cir. 2006).

**16.** "[T]he Unite[d] States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006) (alterations added).

whether a particular demand for payment constitutes a claim, based on the FAR implementing the CDA, the language of the contract in dispute, and the facts of the case." (citing *Garrett v. Gen. Elec. Co.*, 987 F.2d 747, 749 (Fed.Cir.1993)) (footnotes omitted), *reh'g denied* (Fed.Cir.1995); *see also England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed.Cir.2004); *Todd Constr., L.P. v. United States*, 85 Fed.Cl. at 42–43 (citing *H.L. Smith v. Dalton*, 49 F.3d 1563, 1564–65 (Fed.Cir.1995)). The definition of a claim is found in the standard Disputes clause incorporated into DTI's July 26, 2006 ID/IQ contract:

> *Claim*, as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 52.233–1(c) (Disputes (July 2002)). The United States Court of Appeals for the Federal Circuit, in the *Reflectone* case, held that the definition in the FAR "?sets forth the only three requirements of a non-routine 'claim' for money: that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Reflectone v. Dalton*, 60 F.3d at 1575. The Federal Circuit has explained that "the phrase 'as a matter of right' in the regulatory definition of a 'claim' requires only that the contractor specifically assert entitlement to the relief sought. That is, the claim must be a demand for something due or believed to be due. . . ." *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1265 (Fed.Cir.), *reh'g denied*, 186 F.3d 1379

(Fed.Cir.1999). Furthermore, "[i]n defining the jurisdiction of the Court of Federal Claims over CDA disputes, Congress has chosen expansive, not restrictive, language." *Id.* at 1268. The Federal Circuit has explained that "Congress's decision to limit the applicability of the [CDA's] procedures to those claims 'relating to' a contract indicates that the claim at issue must have some relationship to the terms or performance of a government contract." *Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed.Cir.1998).

In addition to the three elements of a claim identified above in *Reflectone*, the Federal Circuit also has identified two "jurisdictional prerequisites" in the CDA that must be met before the Court of Federal Claims has jurisdiction: "All claims by a contractor against the government shall be in writing and shall be submitted to the contracting officer for a decision." *England v. Swanson Group, Inc.*, 353 F.3d at 1379 (quoting 41 U.S.C. § 605(c)); *see also Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed.Cir.2003) ("This court 'know[s] of no requirement in the [CDA] that a "claim" must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'") (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987)) (brackets in original), *reh'g denied* (Fed.Cir.2003); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed.Cir.1996); *Reflectone v. Dalton*, 60 F.3d at 1575; *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578–79 (Fed. Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1994). If, within sixty days, the contracting officer has not issued a final decision or notified the contractor of a reasonable time in which a final decision will be issued, the claim may be deemed denied for purposes of appeal or judicial review. 41 U.S.C. § 605(c). In the present case, the contracting officer issued a contracting officer's final decision, denying DTI's certified claim to the agency.

In support of its breach of contract claim, DTI points to the fair opportunity procedures included in its contract with the government. The Federal Circuit has stated that it is "reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *St. Christopher Assocs., L.P. v. United States,* 511 F.3d 1376, 1384 (Fed.Cir. 2008) (citing *Smithson v. United States,* 847 F.2d 791, 794 (Fed.Cir.1988)). "In sum, there is simply no Federal Circuit precedent holding that it is proper to read into a contract statutes, regulations, or agency guidance when they are not incorporated by reference into the contract." *St. Christopher Assocs., L.P. v. United States,* 511 F.3d at 1384 (footnote omitted). In *Nutt v. United States,* 12 Cl.Ct. 345 (1987), *aff'd sub nom. Smithson v. United States,* 847 F.2d 791 (Fed.Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989), the court stated that,

> when entering into contracts, the Government may include any number of promises to conduct itself in a certain way, for example, by restating regulatory procedures and duties as contractual obligations of the Government. If the Government then violates those regulations, it may become liable for damages for breach of contract.

*Id.* at 351 (citing *Dahl v. United States,* 695 F.2d 1373, 1376, 1381 (Fed.Cir.1982)). Yet the court cautioned that the principles of sovereign immunity and the need for government discretion require that the language of the contract clearly exhibit an intent on the part of the parties to bind themselves; general references to statutes or regulations will not suffice. *Id.* As the court explained,

> the Government will be held to have obligated itself in contract only upon a showing of an express or implied-in-fact agreement to do so. This formidable standard serves to protect the fisc from all suits under contract claims except where the evidence guarantees with some certainty that the Government has agreed to waive its sovereign immunity. It also assures a necessary measure of flexibility to the Government in its daily operations so that it need not answer in damages for each false

step or innocent legal error in administering the myriad of programs and functions that occupy its efforts.

*Nutt v. United States,* 12 Cl.Ct. at 351 (citing *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114).

With respect to the present case, and fair opportunity procedures, FASA provides that, when multiple contracts are awarded, all contractors with master ID/IQ contracts shall be provided a fair opportunity to be considered for task or delivery orders in excess of $2,500.00, "pursuant to procedures set forth in the contracts...." 41 U.S.C. § 253j(b). Similarly, FAR 16.505(b)(1)(ii)(A) and (D) provide that task and delivery order placement procedures that will provide a fair opportunity to be considered for each order must be developed, and the contracting officer must "[i]nclude the procedures in the solicitation and the contract...." 48 C.F.R. § 16.505(b)(1)(ii)(A), (D) ("*Orders under multiple award contracts—(1) Fair opportunity.*"). On October 27, 2006, the contracting officer added Modification P00001 to both ATI's and DTI's contracts. The parties also stipulated that FAR 16.505(b)(1) was incorporated into their contracts by reference.

In addition to identifying a task order ombudsman, Modification P00001 provides as follows:

> Fair Opportunity Procedures (IAW FAR 16.505(b)(1))—
>
> a. Task orders will be issued such that one awardee will be performing tasks under the contract at any one time, for no less time than one month per order.
>
> b. Issuance of the next task order will be on the basis of the best value to the government based on the revised proposals submitted by the awardees pursuant to the corrective action taken in the protest of the first award of this contract, and in accordance with the dismissal of the protest in *Automation Technologies Inc. v. United States,* No. 06–694 (Fed.Cl.2006). Because of the considerable information provided to the contracting officer through the corrective action and revised proposals in this matter, the contracting officer currently "has information available to ensure

each awardee is provided a fair opportunity to be considered for each order" under FAR 16.505(b)(1)(ii).

c. Subsequent task orders will be issued based on a determination of the best value to the government. Price, and past performance on earlier orders under the contract, will be the only factors considered, with price being the most significant consideration in awarding tasks, consistent with FAR 16.505(b)(1)(ii) and (iii).

ATI's and DTI's contracts were further modified with additional task order placement procedures in Modification P00002, emphasizing the regulatory obligation to provide a fair opportunity to compete for task orders, with an effective date of October 27, 2006:

(a) Fair Opportunity for Consideration—

(1) General. One or more task orders may be issued during the ordering period of this contract. The Contracting Officer's (CO) decision to issue a task order to a particular contract holder shall be based on the criteria stated below. In accordance with FAR 16.505(b), the CO will give each contract holder a "fair opportunity to be considered" for each order in excess of $2,500 unless one of the conditions in 16.505(b)(2) applies. Procedures and selection factors to be considered for each task order providing for a "fair opportunity to be considered" are set forth in (a)(2) below.

(2) Procedures providing for a Fair Opportunity to be considered: The Government will provide all awardees a fair opportunity to be considered. This will be provided through the examination by the Government of existing information already in the possession of the Government or through request(s) for task order quotes. In the majority of cases, the Contracting Officer, in coordination with the COTR [contracting officer's technical representative], will be able to select the appropriate awardee based on the data (including awarded CLIN [contract line item number] pricing and the contractor's past performance on earlier orders under the contract) already available to the Government. In other cases, the Government may contact any or all of the contract holders for submission of quotes.

In addition to further addressing the fair opportunity for master contract holders to be considered for task orders, Modification P00002 provided how task orders would be awarded, including the criteria for award.

Defendant does not challenge that the fair opportunity procedures were incorporated into the contract; rather, defendant cites the case of *A & D Fire Protection, Inc. v. United States,* 72 Fed.Cl. 126, in support of its position that the FASA prohibition on protests should apply, even though the claim was brought by plaintiff DTI in the present case under a breach of contract theory. In *A & D,* however, plaintiff did not bring a breach of contract claim, but filed a post-award bid protest, seeking a declaratory judgment voiding the award of a task order to a competitor who, like the plaintiff, held a multiple-award, ID/IQ contract. *Id.* at 127–29. A & D also sought a temporary restraining order and preliminary injunction to stop work on the awarded task order under its bid protest. *Id.* at 127. The awardee in *A & D* had the lower bid on the work, and was rated highest technically, with the technical evaluation more important than price. *Id.* at 129. A & D challenged its evaluation score by the agency, leading to a rescoring by the agency, but the original award decision to A & D's competitor remained the same after rescoring. *Id.* at 130. Defendant and intervenor filed motions to dismiss in *A & D* based on the FASA prohibition on task order protests. *Id.* at 127.

Given the FASA prohibition on task order protests, the court in *A & D* granted the motions to dismiss the case, although the *A & D* opinion further stated that the court "remain[ed] troubled" by the "irregularities in the solicitation of this task order," *id.* at 140, and noted that task order contracts "may be abused when the principles of fair competition are subverted," *id.* The court also noted that task order contracting, by statute and regulation, is required to be fairly administered, and expressed a lack of confidence in the particular agency's procurement procedures for this and other procurements, *id.* The *A & D* court concluded

that "the 'fair consideration' to be offered to bidders such as A & D appears to have been impaired," and that the "treatment of A & D's proposal does not have all the hallmarks of fairness," *id.* at 141. The *A & D* court, however, concluded that its hands were tied by the FASA prohibition on task order protests in the bid protest action, but noted that, since Congress has decided to remove the protections afforded by judicial review of task order protests, "perhaps Congress' interest in procurement reform will someday be rekindled by cases which bear the mark of improprieties, but which stand beyond the reach of judicial review." *Id.* As for Congress' substitute for judicial review, the agency ombudsman, the *A & D* court indicated that it was unaware whether the GSA ombudsman was consulted in *A & D. Id.* This theoretical remedy, for whatever reason, apparently either was not employed, or if employed, produced less than satisfactory results in the *A & D* court's view.

The opinion in *A & D* further noted that a contract claim was not presented to the contracting officer in that case, such that the court would have been without jurisdiction to hear the claim under the CDA. Furthermore, A & D did not submit a bid bond and, therefore, lacked standing to bring its bid protest. *A & D Fire Protection v. United States,* 72 Fed.Cl. at 140.

*A & D* is distinguishable from the present case, in that *A & D* was a classic bid protest of a task order award seeking injunctive relief, which is prohibited by FASA, regardless of the perceived abuses outlined by the court in *A & D; see also Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1374 (Fed. Cir.2009) (FASA "does not limit protests of an overall solicitation or IDIQ contract; it only limits challenges to the task order or delivery order.") (Dyk, J., dissenting, on an issue of standing. However, neither the majority nor Circuit Judge Dyk found fault with this protest of a solicitation for multiple award ID/IQ task order master contracts, based on FASA's prohibition of task order protests only); *Omega World Travel v. United States,* 82 Fed.Cl. at 464 (the court dismissed a protest of a task order award, save for a scope of work issue, which is an excep-

tion to FASA's prohibition on task order protests).

The present case is not a classic bid protest and the remedy sought is not a classic bid protest remedy. The plaintiff has alleged a breach of contract of DTI's master ID/IQ contract. In the present case, the claim to the contracting officer and the contracting officer's denial of the claim were attached to the complaint.

The statute does not provide a clear answer to the issues raised. Nor is there direct precedent to address the situation framed by DTI in the instant case. Although the *A & D* case involved a bid protest, the *A & D* court offered its opinion in dicta as to whether it would have had jurisdiction under the CDA and section 1491(a) of the Tucker Act had plaintiff A & D alleged a breach of contract, based on the fair opportunity procedures incorporated into the plaintiff's contract. *Id.* at 128, 135. The *A & D* court did not have to address the issue because, as the court wrote: "[e]ven assuming CDA jurisdiction would lie for this suit, plaintiff has not alleged that a contract claim has been presented to the contracting officer," which the court noted prohibits jurisdiction in the Court of Federal Claims. *Id.* at 135. The *A & D* court wrote:

> as a general matter, the court does not agree with the theory that actions, that are in essence bid protests of task order awards, can be recharacterized as contract disputes in order to create jurisdiction in this court or in an agency board of contract appeals. *But see* Ralph C. Nash & John Cibinic, *Task Order Contracts: The Breach of Loss of the Fair Opportunity to Compete,* 16 No. 10 Nash & Cibinic Report 49 (Oct.2002) ("Taking a case to the agency board of contract appeals appears to be a viable way to contest the lack of a fair opportunity to compete for task order."). Such a stratagem attempts to evade the bar of task order bid protests clearly enunciated in Section 253j(d). *But see Cmty. Consulting Int'l,* ASBCA 53489, 02–2 BCA ¶ 31940, 2002 WL 1788535 (Aug. 2, 2002) (finding that a contract clause assuring a fair opportunity to compete for task orders gave the board jurisdiction, and finding no

indication in FASA that "Congress explicitly carved out multiple award, task order contracts as an exception to [the board's] Contract Disputes Act jurisdiction"). The court does not find that this type of bid protest action would fall within its CDA jurisdiction.

*Id.* at 135.

Unlike *A & D*, which was purely a task order protest, the Armed Services Board of Contract Appeals case, *Community Consulting International (CCI)*, involved the breach of the master ID/IQ contract, like the present case. CCI alleged breach of the contractual duty to provide a fair opportunity to compete for task orders, in violation of FASA, FAR implementing regulations, and the fair opportunity clause contained in CCI's ID/IQ contract. *Cmty. Consulting Int'l*, ASBCA No. 53489, 02–2 BCA ¶ 31,940, at 157,784–85, 2002 WL 1788535 (CCH). As in the present case, CCI claimed jurisdiction under the CDA, and sought monetary relief. *Id.* Also as in the present case, the government in *CCI* contended that the complaint was really a bid protest, and that the ASBCA, therefore, was without jurisdiction due to the FASA prohibition on task order protests. *Id.* at 157,786, 2002 WL 1788535. CCI responded that it was not objecting to the placement of a task order with another contractor, which would have been a protest, but was seeking to enforce the terms of its master ID/IQ contract, and seeking damages suffered as a result of the government's failure to follow that contract's ordering provisions. *Id.*

Rejecting the government's argument that the dispute was in essence a bid protest, the Board held that it had jurisdiction to hear CCI's claim. *Id.* at 157,786–87, 2002 WL 1788535. CCI alleged that it was denied a fair opportunity to compete for task orders. The Board concluded that CCI's claim was "rooted squarely in [a] contractual promise," and fell within the Board's Contract Disputes Act breach jurisdiction. *Id.* at 157,786, 2002 WL 1788535.

The *CCI* Board opinion also reject[ed] the argument that resort to the task and delivery order ombudsman is appellant's [CCI's] exclusive remedy. Nei-

ther 41 U.S.C. § 235j(e) [sic] not [sic] FAR 16.505 confers remedial powers on the ombudsman. In addition, respondent [the government] does not cite to any provision of FASA, and we know of none, in which Congress explicitly carved out multiple award, task order contracts as an exception to our Contract Disputes Act jurisdiction. While respondent argues that 41 U.S.C. § 253j(e) "creates a forum [the ombudsman] for reviewing IQC [indefinite quantity contract] contractors' complaints and for ensuring that they are afforded a fair opportunity to be considered for task and delivery orders," we decline to regard that provision as an implicit exception to our jurisdiction. "[R]epeals by implication are strongly disfavored ... so that a later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two." *United States v. Fausto,* 484 U.S. 439, 452–53[, 108 S.Ct. 668, 98 L.Ed.2d 830] (1988); *see also Dalton v. Sherwood Van Lines,* 50 F.3d 1014, 1018 (Fed.Cir.1995) (holding that Contract Disputes Act did not impliedly repeal dispute resolution procedures applicable to common carriers in earlier statute). Moreover, the available legislative history does not appear to support the conclusion that Congress intended to establish an exception to our jurisdiction. 41 U.S.C. § 235j(e) [sic] was part of section 1054 of Pub.L. No. 103–355. The conference report regarding section 1054 states that

the conference agreement would provide general authorization for the use of task and delivery order contracts to acquire goods and services other than advisory and assistance services. The conferees note that this provision is intended as a codification of existing authority to use such contractual vehicles. All otherwise applicable provisions of law would remain applicable to such acquisitions, except to the extent specifically provided in this section....

H.R. Conf. Rep. No. 103–712, *reprinted in* 1994 U.S.C.C.A.N. 2607, 2611.

*Id.* at 157,787, 2002 WL 1788535 (other citations omitted; brackets added); *see also L–3*

*Commc'ns Corp.*, ASBCA No. 54920, 06–2 BCA ¶ 33,374, at 165,451–52, 2006 WL 2349233 (CCH) (citing the ASBCA's decision in *Community Consulting International*, and denying the government's motion to dismiss the alleged breach of the Awarding Orders clause of L–3 Communications Corporation's indefinite quantity contract), *subsequent determination, L–3 Commc'ns Corp., Link Simulation & Training Div.*, ASBCA No. 54920, 08–1 BCA ¶ 33,857, at 167,603–05 (CCH), 2008 WL 2154902 (the Board found a breach of the fair opportunity provisions of the contract on some but not on all grounds argued by L–3, concluded that L–3 was entitled to recover costs, but denied L–3 its lost profits because L–3 had not proven that the delivery order would have gone to L–3 rather than to The Boeing Company without the government's breach; and also because L–3 had not met the proximate causation test, citing *California Federal Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.2005) ("the plaintiff must establish that there would have been a profit but for the breach")), *appeal dismissed, L–3 Commc'ns Corp. v. Donley*, No.2008–1579, 2009 WL 464576, at *2 (Fed.Cir. Feb.6, 2009) (dismissed because L–3 failed to file a timely appeal).

In the present complaint, as in *CCI*, DTI presented claims that it was denied a fair opportunity to compete and to be considered for the work contemplated in DTI's ID/IQ master contract when: the government engaged in an improper auction through disclosure of DTI's unit pricing information; the government made a decision to compete the task order, directly contradicting earlier assurances that it would not compete the work unless DTI, as the incumbent, had "severe performance difficulties"; the government included inaccurate descriptions of the scope of work of task orders being competed, although the actual scope of work was known to ATI; the government established the short time frame for bidding on the November 2006, ten-month task order, which was designed by the government with the intent of awarding the task order contract to ATI, whose master contract would have prohibited ATI from receiving an award after December 1, 2006; and that the November 2006 task order solicitation was designed to deny work to DTI. DTI contends that these government actions were done "maliciously, oppressively, and with the intent to injure," reflecting a failure to act in good faith and to provide a fair opportunity to compete for task orders, all of which resulted in a bad faith, constructive termination of DTI's contract.

Agreeing with the Board results in *Community Consulting International and L–3 Communications Corporation*, one commentator on government contracts has stated:

A claim is not a protest. The objectives of claims and protests are entirely different. A protest is filed by a noncontractor seeking to prevent contract award to a competitor; a claim is filed by a contractor seeking money, time, and/or a contract interpretation. (In *Community Consulting*, the contractor sought monetary damages and contract interpretation; in *L–3 Communications*, the contractor sought only monetary damages.) Protests are highly disruptive to Government operations. In response to a protest to the Government Accountability Office, the Government may have to suspend an award or performance pending resolution, 31 USCA § 355(c) and (d)(3); FAR 33.104(b) and (c). The Court of Federal Claims can issue a temporary restraining order, preliminary injunction, and permanent injunction against performance or award and can grant declaratory relief by ordering the agency not to exercise options or even to terminate any contract awarded. Congress banned protests against the award of delivery orders and task order under multiple award IDIQ contracts to streamline the contract formation process by preventing those kinds of disruptions of agency operations. Claims do not disrupt ongoing operations because under the CDA, a board or court cannot suspend award or performance, issue a temporary restraining order, or provide injunctive relief. All that a claim involves is an assertion that the agency breached its contract and the contractor should be given damages for the breach. Claims have virtually no impact on contract performance because the CDA gives

contracting Officers at least 60 days to make a final decision after receipt of the claim, 41 USCA § 605(c)(2), and litigation occurs months if not years later.

The statutory language of the [FASA] protest ban says nothing about claims. See 10 USCA § 2304c(d): [17]

> Protest.—A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued.

That language clearly bars only protests. We agree with the ASBCA that claims are not protests and are not barred by the prohibition against protests.

. . .

Although contractors under multiple award IDIQ contracts cannot protest the award of a task or delivery order, it does not follow that they cannot pursue a claim under the CDA when they think that the Government has breached its promise to give them a fair opportunity to be considered for an order. Protests and claims are very different things in terms of their objectives, the remedies available, and their effect on Government operations.

Vernon J. Edwards, *Postscript: Breach of Loss of the Fair Opportunity to Compete*, 20 No. 12 Nash & Cibinic Report ¶ 59, at 2, 7 (Dec.2006); *see also ABF Freight Sys., Inc. v. United States*, 55 Fed.Cl. 392, 397 (2003) (dismissing three plaintiffs who had brought a bid protest, although all three had received contract awards: "The court does not see how a plaintiff asserting claims pertaining to a contract it has made with the government could be a 'disappointed bidder' for bid protest purposes. . . . Rather, such a plaintiff is a contractor asserting a claim 'relating to a contract' and is subject to the Contract Disputes Act jurisdiction of this court, as set forth in 41 U.S.C. § 609.") (citing *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 77–80 (D.C.Cir.1985); *Davis/HRGM Joint Venture v. United States*, 50 Fed.Cl. 539, 545

(2001); and *Cmty. Consulting Int'l*, 02–2 BCA ¶ 31,940, 2002 WL 1788535).

In *Ingersoll–Rand,* which was decided in 1985, prior to the enactment of FASA in 1994, the United States Court of Appeals for the District of Columbia Circuit assessed the essential nature of the complaint in order to determine whether it was bought in the appropriate forum. *Ingersoll–Rand Co. v. United States,* 780 F.2d at 76–80. Such an analysis is instructive for our purposes. The Ingersoll–Rand Company sought a temporary restraining order and preliminary and permanent injunctions when the agency terminated its contract and resolicited. *Id.* at 75. The court posed the question at issue: "The essential question in this case is whether appellant's claim is 'founded upon an[ ] express or implied contract with the United States.' 28 U.S.C. § 1346(a)(2) (1982). If it is, then the CDA limits adjudication of this dispute to the Claims Court." *Id.* at 76 (brackets in original). The District of Columbia Circuit Court concluded that, "it is possible to conceive of this dispute as entirely contained within the terms of the contract," and that the termination, therefore, should be challenged based on contract principles under the CDA in the Claims Court. *Id.* at 78; *see also Davis/HRGM Joint Venture v. United States,* 50 Fed.Cl. at 544–45 (citing *Ingersoll–Rand Co. v. United States,* 780 F.2d at 79–80, and concluding that a dispute over a termination for the convenience of the government clause incorporated into the contract was in essence a breach of contract claim, not a bid protest, "because the claims involve a dispute arising out of the contract between the parties, and therefore must be brought under the CDA").

This court finds that DTI's complaint is in the nature of a breach of contract claim. DTI asserted jurisdiction under the CDA and section 1491(a)(1) of the Tucker Act. In this opinion, the court does not address whether the government actually breached the contract in this opinion, only that these allegations in DTI's complaint fall with the court's CDA breach jurisdiction. DTI has met the jurisdictional prerequisites of hav-

---

**17.** The FASA prohibition on task order protests was applied to the Department of Defense by 10 U.S.C. § 2304c(d), and to non-DOD agencies such as Customs by 41 U.S.C. § 253j(d).

ing first submitted a written, certified claim to the agency contracting officer, and has obtained a final decision from the contracting officer, who denied the claim and, in fact, informed DTI that it may appeal to the Civilian Board of Contract Appeals or file a claim in this court. FAR 33.210 provides the contracting officer with authority "to decide or resolve all claims arising under or relating to a contract subject to the [CDA]." 48 C.F.R. § 33.210 (Oct. 1, 2008). DTI is not challenging the issuance or proposed issuance of a task order, but seeks monetary damages based on an alleged breach of specific contractual language on ordering provisions in its ID/IQ contract with the government. In FASA, 41 U.S.C. § 253j(d), Congress addressed only the protest of task orders, and did not address the breach of master ID/IQ contracts. Congress has not repealed the jurisdiction of this court to address master ID/IQ breach of contracts claims, and this court declines to act on the government's invitation to partially repeal its CDA jurisdiction by implication. Therefore, because the present dispute has been properly asserted, because the jurisdictional prerequisites have been met, because the claim is tied to specific contractual provisions in DTI's contract with the government, and concerns the administration of DTI's master ID/IQ contract, the court finds that the dispute can be brought in this court as a breach of contract claim. Because FASA, by its terms, only prohibits task order protests, this court has jurisdiction to hear Counts II (fair opportunity to compete) and III (fair opportunity to be considered for additional work) of the complaint regarding the alleged breach of the fair opportunity provisions of DTI's contract.

▪ DTI also alleges "abuse of discretion and bad faith" on the part of the government (Count I), and "Breach of Contract—Obligation to Provide Impartial, Fair and Equitable Treatment to all Contractors" (Count V). Count V cites FAR 1.602 and 3.101. *See* 48 C.F.R. § 1.602–2(b) (2009) ("Contracting officers shall—... (b) [e]nsure that contractors receive impartial, fair, and equitable treatment[.]"), and 48 C.F.R. § 3.101–1 (2009) ("Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."). Defendant moves to dismiss Counts I and V for lack of subject matter jurisdiction.

▪ The same government actions underlying DTI's allegations that it was denied a fair opportunity to compete for task orders appear to be at the heart of DTI's allegations as to government abuse of discretion and bad faith. There appears to be overlap. In any event, the Court of Federal Claims has jurisdiction under the CDA to hear claims of bad faith and abuse of discretion in the administration and termination of a contract. *See, e.g., Keeter Trading Co. v. United States,* 79 Fed.Cl. 243, 248–49, 251–52, 261 n. 4, 263–66 (2007) (for an extensive discussion of bad faith allegations by a government contractor); *North Star Alaska Hous. Corp. v. United States,* 76 Fed.Cl. 158, 189 (2007) ("The bad faith here was pervasive and, over time, metastasized, spreading through and corrupting virtually the entire relationship between plaintiff and defendant.... [T]hat bad faith plainly animated actions by key government officials that effectuated not only a breach of the covenant of good faith and fair dealing, but also many express contract provisions."); *L.P. Consulting Group, Inc. v. United States,* 66 Fed.Cl. 238, 240, 243–44 (2005) (addressing the merits of a bad faith claim brought under the CDA); *see also Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed.Cir.2002) (identifying clear and convincing evidence as the standard of proof for a contractor's allegation of bad faith on the part of the government).

The government argues that FAR 1.602 and 3.101, cited in Count V, were not incorporated into DTI's master contract and therefore do not create any "enforceable obligations." However, there is considerable overlap in plaintiff's allegations concerning the fair and equitable treatment of DTI (FAR 1.602), impartial treatment of DTI (FAR 3.101), and the contract clauses affording DTI a fair opportunity to compete for work. For example, in *L.P. Consulting*

*Group,* involving an alleged breach of indefinite quantity contracts, in which the government either did not proceed with the work or awarded work orders to other contractors, the plaintiff asserted that the government breached the duty to provide plaintiff a fair opportunity to compete for the work orders, and also breached the implied duty of good faith and fair dealing. The *L.P. Consulting Group* court described these overlapping duties as "two sides of the same coin and should be analyzed in kind." *Id.* at 243 (footnote omitted). In the case currently before the court, plaintiff's allegations are in support of its claim that the government breached the fair opportunity procedures in the contract. Fair opportunity and fair treatment and impartial treatment are similar, and will be analyzed together. The court, therefore, declines to grant the government's motion to dismiss these counts at this stage of the case.

Defendant also suggests that the duty to provide impartial, fair and equitable treatment is normally addressed in the context of bid protests. However, DTI has not asserted breach of the duty to provide impartial, fair, and equitable treatment in connection with the protest of the award of a task order. As indicated above, DTI makes its assertions in connection with its breach of the fair opportunity procedures under the contract it had with the government, and a claim of constructive termination of that contract. Therefore, the court will entertain plaintiff's allegations with respect to fair opportunity, fair treatment and impartial treatment as it addresses fair opportunity procedures.

■ Defendant also moves to dismiss DTI's bad faith (Count I), covenant of good faith and fair dealing (Count IV), and constructive termination (Count VI) claims for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). In examining what must be pled in order to state a claim, under both Rule 8(a)(2) of the Rules of the United States Court of Federal Claims and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2);

Fed.R.Civ.P. 8(a)(2). *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The United States Supreme Court, in the *Twombly* case, stated that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

. . .

> [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

*Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555–56, 570, 127 S.Ct. 1955 (footnote and other citations omitted; brackets and omissions in original); *see also Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555–57, 570, 127 S.Ct. 1955); *Cambridge v. United States,* 558

F.3d 1331, 1335 (Fed.Cir.2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim.") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570, 127 S.Ct. 1955); *Cary v. United States*, 552 F.3d 1373, 1376 (Fed.Cir.2009) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face.") (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955), *reh'g denied* (Fed.Cir.), *cert. denied*, —— U.S. ——, 129 S.Ct. 2878, 174 L.Ed.2d 580 (2009).

When deciding on a motion to dismiss based on failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Cambridge v. United States*, 558 F.3d at 1335 (citing *Papasan v. Allain*, 478 U.S. at 283, 106 S.Ct. 2932); *Cary v. United States*, 552 F.3d at 1376 (citing *Gould Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir. 1991)); *Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed.Cir.), *reh'g denied* (Fed.Cir.2006); *Boyle v. United States*, 200 F.3d at 1372; *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998); *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir. 1995). If a defendant or the court challenges jurisdiction or plaintiffs' claim for relief, however, the plaintiffs cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *see also Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d at 747. "A motion to dismiss under Rule [12(b)(6)] for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998).

A complaint also can be dismissed on a Rule 12(b)(6) motion "when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy."

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 708 (3d ed.2008). To qualify, the defense "has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion." *Id.; see also Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir.1993) (citing Wright & Miller, § 1357 at 348–49 (2d ed.1990); *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir.1990), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992)) (holding that, although Rule 12(b)(6) motions are not generally intended to address the merits of affirmative defenses, in the limited circumstances when the complaint gives rise to one, the defense may be raised under Rule 12(b)(6), as long as it appears clearly on the face of the complaint).

Affirmative defenses that have been considered under a Rule 12(b)(6) motion to dismiss, include, among others, "various types of estoppel" and "the barring effect of res judicata and related preclusion principles." 5B Wright & Miller, *Federal Practice and Procedure* § 1357 at 722, 728 (3d ed.2008); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 n. 3, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (noting that the dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits); *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir.) (holding that the affirmative defense of res judicata may be upheld on a motion to dismiss under Rule 12(b)(6) "when all relevant facts are shown by the court's own records, of which the court takes notice"), *cert. denied*, 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992). Moreover, "a court may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact." *Andrews v. Daw*, 201 F.3d 521, 524 n. 1 (4th Cir.2000).

Defendant moves to dismiss DTI's bad faith (Count I), covenant of good faith and fair dealing (Count IV), and constructive termination (Count VI) claims for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). These allegations overlap with the fair opportunity to

compete (Count II), fair opportunity to be considered for work (Count III), and providing fair treatment for contractors (Count V). The following factual allegations of government actions all support the varying allegations of unfair treatment. DTI alleges that the government engaged in an improper auction through disclosure of DTI's pricing information; that the government's decision to compete task orders directly contradicted earlier assurances that it would not compete the work unless DTI, as the incumbent, had "severe performance difficulties"; through inaccurate descriptions of the scope of work of task orders being competed when the actual scope of work was known to ATI; that the short time frame for bidding on the November 2006 ten-month task order was designed by the government with the intent of awarding the task order contract to ATI, whose master contract would have prohibited ATI from competing beyond December 1, 2006; and that, effectively, the November 2006 task order solicitation was designed to deny work to DTI. DTI contends that these government actions were done "maliciously, oppressively, and with the intent to injure," reflecting a failure, in good faith, to provide a fair opportunity to compete for task orders, and resulting in the agency's bad faith, constructive termination of DTI's contract. DTI claims that Customs used the solicitation as a means to "get rid of" DTI as a contractor and move to a sole-source scenario with ATI. On the allegation of bad faith, as indicated in the *North Star* case, plaintiff need not show that "each action harmful to [plaintiff] was independently animated by animus." *North Star Alaska Hous. Corp. v. United States,* 76 Fed.Cl. at 189. The court's inquiry should be regarding the facts and the pattern of behavior asserted by DTI to test whether plaintiff can establish bad faith entitling DTI to relief. In support of these allegations as to bad faith and fair treatment, DTI has alleged sufficient facts in its complaint to warrant further inquiry regarding entitlement to relief.

In support of its motion to dismiss for failure to state a claim, defendant claims that DTI has not tied its bad faith claims to particular provisions in the contract. *See Alaska v. United States,* 35 Fed.Cl. 685, 704 (1996) ("[Plaintiff] begins with the obligation, implied into every contract, that both parties will act in good faith and observe reasonable commercial standards of fair dealing in performing the contract. *Restatement (Second) Contracts* § 205.... The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties."), *aff'd,* 119 F.3d 16, 1997 WL 382032 (Fed.Cir.1997) (table), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998). In this regard, we do not have to go far to find a substantive obligation on the part of the government. FASA, FAR provisions implementing FASA, and P00001 and P00002 contract modifications by the contracting officer all obligate the government to provide DTI a fair opportunity to compete for work. The court finds that DTI's bad faith and unfair dealing claims are sufficiently alleged and attached to the fair opportunity procedures incorporated into the contract, and address the government's contract administration.

■ Defendant also argues that DTI cannot recover the "lost profits" DTI seeks from its alleged constructive, wrongful termination claim, such that DTI has not stated a claim upon which the relief it requests can be granted. Defendant argues that if there were a wrongful termination, which it contends there was not, the wrongful termination would merely be converted into a termination for the convenience of the government, which limits DTI's recovery to costs incurred and profits on work which DTI actually completed by the point of termination. DTI's contract contains the clause at FAR 52.212–4, titled "Contract Terms and Conditions—Commercial Items (Sep 2005)," which, at paragraph (m) states: "If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience." 48 C.F.R. § 52.212–4(m). Furthermore, paragraph (*l*) of the Contract Terms and Conditions states that a termination for the convenience of the government would limit damages to "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges

... [which] have resulted from the termination." 48 C.F.R. § 52.212–4(1); *see also Praecomm, Inc. v. United States*, 78 Fed.Cl. 5, 12 (2007) ("Under the termination-for-convenience clause, anticipatory profits and consequential damages are not recoverable.") (citing *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1323–24 (Fed.Cir. 2007)), *aff'd*, 296 Fed.Appx. 929 (Fed.Cir. 2008).

DTI responds that the constructive termination of its contract cannot be converted into a termination for convenience of the government because the government acted in bad faith. Allegations of bad faith change the above analysis. "[I]f a contractor can successfully demonstrate that a CO's [contracting officer's] decision to terminate its contract for default was made in bad faith, the contractor will not be limited to damages in accordance with the termination for convenience clause. Instead, the contractor may recover traditional breach of contract damages." *Keeter Trading Co. v. United States*, 79 Fed.Cl. at 263 (citing *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 772 (1982)); *see also Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 204, 543 F.2d 1298, 1304 (1976) ("In the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the [termination for the convenience of the government] clause."), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Because DTI has alleged a bad faith, constructive termination of its contract, lost profits as breach of contract damages are at least theoretically possible, and the government's motion to dismiss for failure to state a claim upon which relief can be granted fails at this time.

Defendant also challenges DTI's claims for lost profits as too speculative to permit recovery. The United States Court of Appeals for the Federal Circuit has held that damages for a breach of contract are recoverable if:

(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed.Cir.2002). While the amount of damages need not be "ascertainable with absolute exactness or mathematical precision[,]" recovery for speculative damages is precluded. *San Carlos Irrigation & Drainage Dist.*, 111 F.3d [1557,] 1563 [(Fed.Cir.1997)] (citation omitted).

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed.Cir.), *reh'g denied* (Fed.Cir.2005). Defendant's argument that damages are speculative requires a more fully developed record to properly address; for that matter, plaintiff has not yet even established its entitlement to damages.

With respect to options, the court notes defendant's argument that the government was not obligated to exercise any of the options in DTI's contract. Defendant contends that the government's obligations did not extend beyond providing the minimum $2,500.00 worth of task orders, as provided for in DTI's contract, a minimum requirement with which the government complied. In this regard, the Federal Circuit, in *Travel Centre v. Barram*, held that:

while an IDIQ contract provides that the government will purchase an indefinite quantity of supplies or services from a contractor during a fixed period of time, it requires the government order only a stated minimum quantity of supplies or services. 48 C.F.R. § 16.504(a) (2000). *See also Dot Sys., Inc. v. United States*, 231 Ct.Cl. 765 (1982). That is, under an IDIQ contract, the government is required to purchase the minimum quantity stated in the contract, but when the government makes that purchase its legal obligation under the contract is satisfied. *See, e.g., Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343, 1346 (1980). Moreover, once the government has purchased the minimum quantity stated in an IDIQ contract from the contractor, it is free to purchase additional supplies or services from any other source it chooses.

*Travel Centre v. Barram,* 236 F.3d 1316, 1319 (Fed.Cir.2001) (citations omitted). This issue was addressed, and the analysis taken to the next step, by the Armed Services Board of Contract Appeals in *CCI.* The Board in *CCI* addressed the government's contention that CCI had already received the guaranteed minimum work and, therefore, was not entitled to further relief because the government had met its legal obligation under the master contract. *Cmty. Consulting Int'l,* 02–2 BCA ¶ 31,940, at 157,789, 2002 WL 1788535. The Board in *CCI* rejected the government argument:

> We recognize that, under an indefinite quantity contract, "the government is required to purchase the minimum quantity stated in the contract, but when the government makes that purchase, its legal obligation under the contract is satisfied." *Travel Centre v. Barram,* 236 F.3d 1316, 1319 (Fed.Cir.2001). While the minimum quantity represents the extent of the Government's purchasing obligation, however, it does not constitute the outer limit of all of the Government's legal obligations under an indefinite quantity contract.

> *Burke Court Reporting Co.,* DOT BCA No. 3058, 97–2 BCA ¶ 29,323 at 145,801, 1997 WL 570680, recognized this principle. There, the contractor entered into a multiple award, indefinite quantity, task order contract. The contractor received more than the guaranteed minimum but filed a breach of contract claim, contending that the contracting officer had arbitrarily exercised her discretion in awarding task order and "ignored the factors listed in the contract to be considered before a task order was issued." *Id.* The board denied the Government's motion for summary judgment, concluding that the award of more than the guaranteed minimum did not relieve the Government of other contractual obligations:

> > ... While the indefinite quantities clause of the contract only obligates respondent to order a specified dollar amount of services, a bidder has a right to rely on other contract provisions implying that it will be fairly considered for additional work, if required by the government.

*Id.; see also Innovative (PBX) Tel. Servs., Inc. v. Dep't of Veterans Affairs,* CBCA Nos. 44, 45, 46, 576, 08–1 BCA ¶ 33,854, at 167,584 (CCH), 2008 WL 1960352 (damages may be awarded "for unexercised option years of a contract if a contractor proves that the decision not to exercise an option was a product of bad faith or so arbitrary and capricious as to be an abuse of discretion.") (quoting *Blackstone Consulting, Inc. v. Gen. Servs. Admin.,* CBCA No. 718, 08–1 BCA ¶ 33,770, at 167,159 (CCH), 2008 WL 217660). Although still at the allegations stage, the matters pled in the case currently before the court and the reasoning of the ASBCA in *CCI,* although not binding, raise sufficient issues needing resolution to warrant denying the government's motion to dismiss for failure to state a claim. These matters should be decided on the merits.

### CONCLUSION

For the foregoing reasons, the court has jurisdiction to review the plaintiff's breach of contract complaint. Defendant's RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted are denied.

**IT IS SO ORDERED.**