**UNISYS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Computer Sciences Corporation, Defendant–Intervenor.**

No. 09–800C.

United States Court of Federal Claims.

Dec. 18, 2009.

---

10. The court notes that defendant did not file an opposition to plaintiff's application to proceed *in forma pauperis.*

Richard J. Webber, Arent Fox LLP, Washington, D.C., for plaintiff. Kavitha J. Babu, Arent Fox LLP, Washington, D.C., and Anne H. Warner, Unisys Corporation, Reston, VA, of counsel.

Meredyth Cohen Havasy, Trial Attorney, Mark A. Melnick, Assistant Director, Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

Carl J. Peckinpaugh, Assistant General Counsel, Computer Sciences Corporation, Falls Church, VA, for intervenor. Jill R.N. Chung, Computer Sciences Corporation, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This unusual case involves Congress's recent decision to limit the jurisdiction of a parallel system for protesting certain government procurements, and expand the existing process at the Government Accountability Office ("GAO"). The protestor asserts that the procurement at issue is within the jurisdiction of GAO and that the procuring agency, the Transportation Security Administration ("TSA") must either stay performance of the contract until the conclusion of the protest in accord with 31 U.S.C. § 3553 or follow the statutory procedure for overriding that automatic stay. The Government contends that this solicitation remains under the for-

mer, parallel system, and that the automatic stay provision of § 3553 is inapplicable. The Court concludes that whether or not the procurement was conducted under the former system, the automatic stay provision is applicable, and TSA is therefore required to stay performance of the contract at issue until GAO resolves the protest or TSA seeks to override the stay. The Intervenor's Motion for Declaratory Judgment and the Defendant's Motion to Dismiss are therefore **DENIED,** and the Plaintiff's Motion for Declaratory Judgment is **GRANTED.**

## I. Background

### A. Statutory and Regulatory History

GAO (sometimes referred to by the title of its director, *i.e.,* the Comptroller General) has exercised informal authority to adjudicate bid protests essentially since its formation as the Government Accounting Office in 1921. *Letter from Comptroller General McCarl to the Postmaster General, Acceptance of Other than the Lowest Bid,* A–11757, 5 Comp. Gen. 330, 331 (Nov. 5, 1925). This authority became formal with the passage of the Competition in Contracting Act of 1984, Pub.L. No. 98–369, 98 Stat. 1175 (1984) (codified in scattered sections of 31 U.S.C. and 41 U.S.C.) ("CICA").

In 1996, however, Congress decided to require the Federal Aviation Administration ("FAA") to develop its own unique acquisition system, ultimately called the Acquisition Management System ("AMS"). Department of Transportation Appropriations Act of 1996, Pub.L. No. 104–50, § 348, 109 Stat. 436, 460 (1995) (codified as amended in scattered sections of 49 U.S.C.). This act exempted the AMS from "all federal acquisition laws and regulations," including CICA, and GAO thus no longer possessed jurisdiction to resolve disputes arising out of FAA procurements. *Id.* The FAA created an Office of Dispute Resolution for Acquisition ("ODRA") with exclusive jurisdiction over FAA bid pro-

tests. *See, e.g.,* Pub.L. No. 108–176, § 224(b), 117 Stat. 2490, 2528 (codified as amended at 49 U.S.C. § 40110(d)(4)); Attachment 1 to Defendant's Motion to Dismiss and Opposition to Plaintiff's Motion for Declaratory Judgment (docket entry 15, Dec. 4, 2009) ("Def.'s Mot.") (memorandum of Sept. 16, 2002 delegating authority to ODRA); Attachment 2 to Def.'s Mot. (memorandum last signed in 2004 delegating authority to ODRA). As of 1996, therefore, there were, as is pertinent here, two separate administrative fora for bid protests, depending upon whether the FAA was the procuring agency.

In November 2001, Congress created the TSA to improve aviation security in the wake of the terrorist attacks that September. Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597 (2001) ("ATSA"). Congress directed TSA to utilize the AMS, as established by the FAA, for its acquisitions of "equipment, supplies, and materials." *Id.* § 101(n), 115 Stat. at 600. Although in 2002 the TSA was placed under the control of the new Department of Homeland Security ("DHS"), the 2002 Homeland Security Act did not alter the handling of TSA procurements through the AMS rather than generally applicable laws and regulations. Homeland Security Act of 2002, Pub.L. No. 107–296, § 424, 116 Stat. 2135, 2185 (2002). In 2005, Congress included "services" among the items TSA was required to procure through the AMS. Department of Homeland Security Appropriations Act of 2006, Pub.L. 109–90, 119 Stat.2064, 2070 (2005). Because DHS is subject to those generally applicable laws and regulations, including the Federal Acquisition Regulation ("FAR") and the jurisdiction of GAO, TSA's use of the AMS created some problems.

In part to place all DHS entities on the same system and thus improve efficiency in contracting, in 2007 Congress repealed the statutory provision placing TSA procurements under the AMS.[1] Consolidated Appro-

---

1. In introducing the Senate version of the bill eventually incorporated into the 2008 Consolidated Appropriations Act, Senator John Kerry stated that Congress's direction that TSA conduct its procurements through the AMS rather than pursuant to generally applicable laws and regula-

tions "was never meant to be permanent" and, given reports that "TSA is rapidly becoming the poster child for contracting dysfunction, ... we would be remiss in our oversight responsibilities if we did not repeal" Congress's 2001 directive

priations Act of 2008, Pub.L. No. 110–161, § 568, 121 Stat. 1844 (2007). The change in jurisdiction was to take place "180 days after the date of enactment of this Act"—that is, on June 23, 2008. *Id.* § 528(b). In response to this new law, DHS promulgated a regulation stating that "TSA acquisitions initiated after June 22, 2008" would be subject to the FAR. 73 Fed.Reg. 30,317 (May 27, 2008) (codified at 48 C.F.R. § 3001.104(b)). GAO issued a final rule stating that it would "hear protests of TSA procurements covered by TSA solicitations issued on or after June 23, 2008." 73 Fed.Reg. 32,427, 32,429 (June 9, 2008). These are two slightly differing statements of when the new regime begins: when an "acquisition" is "initiated" versus when a "solicitation" is "issued."

### B. History of this Procurement

The procurement at issue here involves Information Technology Infrastructure Program ("ITIP") services, which allow DHS to process and transfer voice, video, and digital communications over computers, telephones, facsimile machines, and copiers, among other things. Def.'s Mot. at 4. To obtain these services, in June 2006 DHS required all of its component agencies to utilize a broad indefinite delivery/indefinite quantity ("IDIQ") contract called the Enterprise Acquisition Gateway for Leading Edge Solutions ("EAGLE") contract. Attachment 4 to Def.'s Mot. Unisys was one of the EAGLE awardees. Attachment 7 to Def.'s Mot. at 8. All of the EAGLE awardees would then compete for individual task orders to perform specific work for entities within DHS.

On April 17, 2008, TSA issued a "Request for Multi–Phased Proposal," asking the EAGLE awardees to submit proposals for providing ITIP services to TSA. Attachment 6 to Def.'s Mot. ("Phase 1 RFP"). The Request for Task Order Proposal stated that "[o]fferor selection for Phase 1 of this DHS requirement . . . will be made using a multi-phased process under the EAGLE contract." *Id.* at 1. TSA would receive and evaluate proposals, and then "there will be a down select con-

ducted prior to continuing on to the second part of this competition, which will involve the issuance of a Request for Techncial, Management, and Cost Proposal." *Id.; see also id.* at 3 ("This request for a Phase 1 proposal is the first in a two-part process to assess your capabilities in performing the work described in the Statement of Work (SOW). There will be a down-select prior to continuing onto the second part of this competition, which will involve the issuance of a full Request for Technical, Management, and Cost Proposal (Phase 2)."). Responses to the Phase 1 RFP were due by May 14, 2008. *Id.* at 3.

Unisys, the incumbent TSA ITIP contractor, submitted a timely response to the Phase 1 RFP, but was notified on June 26, 2008 that it "had not been selected to continue to Phase 2 of the procurement" because its proposal "was not the most advantageous to the Government." Attachment 7 to Def.'s Mot. at 3 (internal quotations omitted). Unisys submitted protests to both GAO and ODRA, arguing that according to the terms of the Phase 1 RFP, price was not to be considered and therefore whether Unisys was the "most advantageous" should not yet have been decided.[2] *Id.* at 4; Attachment 9 to Def.'s Mot. at 4.

In both of its Phase 1 protests, Unisys acknowledged that it was not clear whether ODRA or GAO was the proper forum. Attachment 7 to Def.'s Mot. at 5. The EAGLE contracts were DHS contracts, and DHS was governed by the FAR, which would make GAO the proper forum. The task order, on the other hand, was issued by TSA, and TSA acquisitions were governed at that time by the AMS, pursuant to which protests were to be heard by ODRA.

#### 1. ODRA Phase 1 Protest

In the ODRA protest, Unisys contended that ODRA was the proper forum because Unisys was "not challenging any provisions of the EAGLE contract, nor any actions of DHS' contracting officer relating to that un-

---

that TSA utilize the AMS system. 153 Cong. Rec. S10613–14 (daily ed. Aug. 1, 2007).

**2.** Phase 1 offeror Northrup Grumman also submitted a protest to ODRA, and the protests were consolidated. Attachment 11 to Def.'s Mot. at 1.

derlying IDIQ contract."[3] *Id.* The ODRA Director concluded that ODRA possessed jurisdiction over the Phase 1 protest, reasoning that "at the time the Solicitation for Phase 1 was issued," the only statutory authority for TSA to make acquisitions was through the AMS and "even where ... the TSA employs an underlying FAR-based contract vehicle, its evaluation and selection process are governed by the standards and principles of the AMS."[4] Attachment 11 to Def.'s Mot. at 2. Thus, this must be reviewed as an "AMS procurement." *Id.* Unisys "re-affirmed [its] preference to pursue its protest at the ODRA." *Id.*

### 2. *GAO Phase 1 Protest*

In the Phase 1 protest Unisys filed at GAO, Unisys argued that "it appears that GAO has jurisdiction over this protest" because "[t]he EAGLE contract was competed under, and is subject to, the FAR in all respects." Attachment 9 to Def.'s Mot. at 5. Unisys noted that "GAO has not previously been asked to determine whether it has jurisdiction over a TSA task order procurement, where that task order procurement is subordinate to an IDIQ contract over which GAO clearly has jurisdiction," especially when, as here, the underlying Request for Task Order Procurement made no reference to the AMS. *Id.* at 7. Unisys contended that "ODRA has jurisdiction, if TSA is deemed to be acting under the AMS, but not otherwise," and due to the uncertainty, Unisys would be filing simultaneous protests. *Id.* ("Unisys will proceed in whichever forum determines that it has jurisdiction. If both fora find jurisdiction, Unisys will voluntarily dismiss one of the two protests.").

TSA responded that its procurement authority was only pursuant to the AMS, and "the presence of FAR provisions ... do[es] not have any legal effect upon TSA's AMS procurement authority." Attachment 12 to Def.'s Mot. at 3 ("ATSA provides the AMS authority for TSA procurements and AMS procurements do not come under the protest jurisdiction of the GAO."). GAO later "indicated that it would take jurisdiction," but "to date has not provided any further explanation." Attachment 11 to Def.'s Mot. at 2. On August 1, 2008, Unisys elected to proceed at ODRA and withdrew its GAO Phase 1 Protest. Attachment 12 to Def.'s Mot.

As a result of the Phase 1 protests, TSA took corrective action and did not downselect any of the Phase 1 offerors, allowing them all to proceed to Phase 2. Memorandum in Support of Plaintiff's Application for a Temporary Restraining Order at 6 (docket entry 7, Nov. 19, 2009) ("Pl.'s Mem."). According to the Government, only Phase 1 offerors were permitted to proceed to Phase 2. Def.'s Mot. at 3. *But see* Plaintiff's Response to Defendant–Intervenor's Motion for Declaratory Judgment and Defendant's Motion to Dismiss at 18 n. 6 (docket entry 17, Dec. 11, 2009) ("Pl.'s Reply") ("If so, that was not a limitation imposed by any regulation on TSA, nor is there any reason to believe that any vendors other than the six that submitted information pursuant to the Phase I Solicitation had any interest in competing.").

### 3. *Phase 2 Solicitation*

On December 12, 2008, TSA released a revised ITIP Phase 2 solicitation seeking offers proposing technical, management, performance, and price proposals. Attachment

---

**3.** Unisys confessed, however, that the prior ODRA cases were all distinguishable because in those cases "the task order solicitation specifically incorporated the AMS as the basis for the procurement and specifically provided for the filing of bid protests at ODRA," while the Phase 1 RFP contained no such language. Attachment 7 to Def.'s Mot. at 7. "At the direction of the ODRA," TSA filed a brief in the ODRA protest likewise arguing that ODRA was the proper forum, while moving to dismiss the GAO protest on jurisdictional grounds. Attachment 11 to Def.'s Mot. at 2.

**4.** The ODRA Director expressed his "serious concerns about the adequacy of the Solicitation for Phase 1." Attachment 11 to Def.'s Mot. at 3. He observed that it may have been "materially defective in that it did not reference or incorporate the AMS, or include mandatory clauses such as the Bid Protest Clause. It was only after the down-selection of the Protesters that the TSA included required AMS provisions as part of the Solicitation for Phase 2. Thus, the Protesters arguably were not on notice in Phase 1 of fundamental information regarding the acquisition system and rules that would apply to the competition." *Id.*

3 to Def.'s Mot. This was, Unisys points out, nearly six months after the June 23, 2008 expiration of TSA's ability to utilize the AMS procedures. Paragraph I.2 of the Phase 2 solicitation stated:

I.2.1 Protests

AS A CONDITION OF SUBMITTING AN OFFER OR RESPONSE TO THIS RFI/RFP (OR OTHER SOLICITATION, IF APPROPRIATE), THE OFFEROR OR POTENTIAL OFFEROR AGREES TO BE BOUND BY THE FOLLOWING PROVISIONS RELATING TO PRO-TESTS:

(a) Protests concerning Transportation Security Administration's (TSA) Request for Information/Request for Proposals (RFI/RFPs) or awards of contracts shall be resolved through the dispute resolution system at the FAA Office of Dispute Resolution for Acquisition (ODRA) and shall be governed by the procedures set forth in 14 C.F.R. Parts 14 and 17, which are hereby incorporated by reference. Judicial review, where available, will be in accordance with 49 U.S.C. 46110 and shall apply only to final agency decisions. A protestor may seek review of a final TSA decision only after its administrative remedies have been exhausted....

Attachment 3 to Def.'s Mot. at 53–54

On the other hand, the Phase 2 solicitation incorporated Section G of the EAGLE contract by reference, Ex. 3 to Compl. at 19, and Section G in turn stated that task order protests were to be conducted "[i]n accordance with FAR Part 16.505(a)(9)"—which would mean that they were to be brought at GAO.[5] Attachment 4 to Def.'s Mot. at 27. Further, paragraph 5 of Section G required all task orders to be "subject to the terms and conditions of the [EAGLE] contract. This contract shall control in the event of conflict with any [task] order." *Id.* at 28.

4. *Phase 2 Award and Protests*

TSA awarded the ITIP task order, valued at $492,182,701, to Computer Sciences Corporation ("CSC") on September 25, 2009. Attachment 13 to Def.'s Mot. at 1; Compl. ¶ 1. Unisys and General Dynamics One Source LLC both filed post-award protests of this award at GAO. On October 14, Unisys also filed a protest at ODRA "to protect its position until any jurisdictional issues were resolved." Pl.'s Mem. at 10. The protest at ODRA stated that:

While the December 12, 2008 issuance date of the ITIP Phase 2 Solicitation suggests that GAO has jurisdiction rather than ODRA, there are two complicating facts. First, the Phase II Solicitation uses the same Solicitation number as was used for Phase I, and the issuance of the Phase I Solicitation occurred back in the spring of 2008 prior to the change of the procurement regimen from the AMS to the FAR. Indeed, as a result of Unisys' protest of the Phase I decision, ODRA held that the Phase I Solicitation was necessarily conducted under the AMS and that ODRA had jurisdiction over Unisys' Phase I protest as a result. Thus, if the Phase II Solicitation is considered to be a continuation of the earlier Solicitation, it can be argued that ODRA has jurisdiction over this protest.

Attachment 15 to Def.'s Mot. at 2–3. Unisys also stated that the clause in the Phase 2 solicitation requiring protests to be filed at ODRA might be relevant. *Id.*

TSA filed a motion to dismiss the GAO protest for lack of jurisdiction, Attachment 16 to Def.'s Mot., which Unisys opposed, Attachment 13 to Def.'s Mot. On October 28, 2009, the GAO attorney advised the parties that "we have decided that we will take jurisdiction and entertain these protests." Attachment 19 to Def.'s Mot. When GAO

---

5. FAR 16.505(a)(9) states that

No protest under Subpart 33.1 is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except for—
(A) A protest on the grounds that the order increases the scope, period, or maximum value of the contract; or

(B) A protest of an order valued in excess of $10 million. *Protests of orders in excess of $10 million may only be filed with the Government Accountability Office, in accordance with the procedures at 33.104.*
(emphasis added)

advised the parties that it possessed jurisdiction, Unisys withdrew its ODRA protest, which ODRA then dismissed. Pl.'s Mem. at 10; Attachment 20 to Def.'s Mot.

The issue presented here deals with the so-called "automatic stay" that applies to protests filed at GAO. Section § 3553 of CICA provides that "if the Federal agency awarding the contract receives notice of a protest in accordance with this section ... the contracting officer shall immediately direct the contractor to cease performance under the contract" 31 U.S.C. § 3553(d)(3)(A)(ii). A "protest" is a "written objection by an interested party to ... [a] solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services ... [or] [a]n award or proposed award of such a contract." *Id.* § 3551(1). The agency may override the automatic stay if it makes a "written finding that ... performance of the contract is in the best interests of the United States; or ... urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for a decision of the Comptroller General concerning the protest." *Id.* § 3553(3)(C)(i)(I) & (II).

The terms of § 3553 require the agency to automatically stay performance of a contract award when a federal agency receives notice of a GAO protest within five days after an unsuccessful offeror's debriefing date. 31 U.S.C. § 3553(d)(3)(A)(ii), (d)(4)(B). Apparently to comply with § 3553, TSA issued a directive on October 13, 2009 staying performance of the CSC contract. Ex. 4 to Compl. ("TSA has received official notification from GAO that a protest has been filed against the award of Task Order HSTS03–09–C–CIO632. The protest was filed within five days of debrief and therefore the award is subject to an immediate stay of performance. Effective immediately, CSC shall stop all work under the subject award.").

On November 10, 2009, TSA advised the parties that it was cancelling the stay of performance, on the grounds that the Phase 2 procurement was under AMS, not the FAR, and thus ought to be protested at

ODRA. Ex. 5 to Compl. at 2 ("[S]ince these matters are not properly before the Comptroller General, the cognizant contracting officer today cancelled the stop work order on the CSC contract, thereby requiring the contractor to resume performance of the contract."). TSA did not issue any of the findings required by 31 U.S.C. § 3553(d)(3)(C) for a formal override of the automatic stay. Compl. ¶ 24. When TSA did not send the agency record to GAO within 30 days of the protest filing, as required by 31 U.S.C. § 3553(b)(2)(A), GAO advised TSA that it was in violation of the statute. TSA stated that "[t]he Agency Record will not be filed with GAO. It is anticipated that the matter will be refiled at the FAA Office of Dispute Resolution for Acquisition in accordance with the Solicitation." [6] Ex. 6 to Compl. (Nov. 10, 2009 letter).

On November 17, 2009, Unisys sent a pre-filing notice indicating its intent to file this lawsuit. Rules of the Court of Federal Claims, App. C, ¶ 2. On the same date, TSA issued a second stop-work order to CSC. Ex. 7 to Compl. The Department of Justice advised Unisys that "TSA reserved the right to withdraw the stop-work order so that CSC's performance would commence yet again." Pl.'s Mem. at 12; *id.* at 13 ("It is apparent that the stop-work order under the above provision is not a reinstatement of the statutory stay, nor ... [does TSA] acknowledge[] the jurisdiction of GAO over the Unisys protest."). Counsel for Unisys attempted to obtain assurance that the stop-work order would remain in effect for the duration of the GAO protest, but "TSA counsel refused to provide that assurance." Pl.'s Mem. at 13. On November 19, 2009, plaintiff filed the present lawsuit.

The Court held a status conference with the parties, including the probable intervenor, on November 20, 2009. At the conclusion of that conference, the Court stated that it would construe plaintiff's previous filings as a motion for declaratory judgment that the CICA automatic stay provision applied to its GAO protest, and set an expedited briefing schedule. TSA agreed that it would

---

**6.** After a conference call with GAO, TSA released the agency record to GAO while preserving its

position on GAO's jurisdiction. Attachment 26 to Def.'s Mot.

maintain its stop-work order in effect until the Court resolved the motion for declaratory judgment.

## II. Discussion

### A. The Court Possesses Jurisdiction

■ This court does not review GAO decisions as an appellate court, and has no authority to "review GAO's procedural or substantive decisions." *Centech Group, Inc. v. United States,* 78 Fed.Cl. 496, 498 (2007). This court does, however, have jurisdiction under the Tucker Act to "render judgment on an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Federal Circuit has held that 31 U.S.C. § 3553 is a statute "in connection with a procurement," the alleged violation of which provides this court with jurisdiction. *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir. 1999) ("As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."). When, for example, an agency decides to override the automatic stay, the agency's actions "so clearly affect the award and performance of a contract [that] this court has little difficulty concluding that that statute has a 'connection with a procurement.'" *Id.; see also ES–KO, Inc. v. United States,* 44 Fed.Cl. 429 (1999) (applying same reasoning to violations of regulation governing agency-level protests).

■ This court therefore reviews an agency's compliance with § 3553 "independent of any consideration of the merits of the underlying contract award." *Planetspace Inc. v. United States,* 86 Fed.Cl. 566, 567 (2009). Although "the Comptroller General of the United States" has "exclusive jurisdiction" over protests of task orders valued in excess of $10 million, this lawsuit does not concern the task order itself, but merely whether TSA wrongfully failed to comply with 31 U.S.C. § 3553. National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110–181, § 843, 122 Stat. 3, 236 (codified at 10 U.S.C. § 2304c); *see also Digital Techs. v. United States,* No. 08–604C, 2009 WL 4785451 (Fed.Cl. Dec. 9, 2009). This Court thus possesses jurisdiction to review the alleged violation of § 3553.

### B. Plaintiff Possesses Standing and the Issue is Ripe for Review

■ The Government argues that because TSA has implemented a voluntary stop-work order (which it retains the right to rescind at any time) this case is "not ripe" for decision because the plaintiff is not presently suffering any injury from the transition to the new awardee. However, that misstates the proper analysis. Plaintiff possessed standing to sue and the applicability of the automatic stay was ripe for review on November 10, 2009, when, after the filing of the GAO protest, TSA cancelled the stay of performance. The proper question is whether TSA's voluntary cessation of that conduct has now rendered the case "unripe"—that is, moot. Because TSA insists that it reserves the right to resume work at any time, plaintiff retains standing and the case remains ripe for review. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 719, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (noting that voluntary cessation did not terminate plaintiffs' standing when school district continued to vigorously defend its position in court); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways.") (internal citations, quotations and alterations omitted); *United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (party whose actions threaten to moot a case must make "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"); *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (voluntary cessation of illegal activity will not render case moot unless there is "no reasonable expectation that the wrong will be repeated" (internal quotation marks omitted)). Unlike cases capable of repetition but

evading review, where the plaintiff must demonstrate the likelihood that the conduct in question will recur, in a voluntary cessation case the defendant bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693 (internal quotations omitted). Defendant has not attempted to make such a showing, and thus its "ripeness" argument fails.

### C. The Automatic Stay Applies When Statutory Requirements Are Met Whether or Not the Protest is Properly Filed at GAO

█ The parties brief a great deal of law, but do not adequately focus on the language of the statute at issue in this case, CICA. Section 3553(b)(1) of CICA requires GAO to notify the "Federal agency involved" within "one day after the receipt of a protest." Once that notice occurs, then either (1) the agency must provide a report at a specified time or (2) GAO may dismiss the protest under § 3554(a)(4).

The agency only has a duty to suspend performance under § 3553 if it receives notice from GAO within ten calendar days of contract award or within five days after debriefing of an unsuccessful offeror. *See, e.g.*, *Tech. for Commc'ns Int'l v. Garrett*, 783 F.Supp. 1446, 1453 (D.D.C.1992) (concluding that post-award stay provision was not triggered although protester filed protest within ten days of contract award, because GAO did not notify agency until the fourteenth day after contract award). GAO may simply decline to notify the agency if the filing does not meet the definition of a "protest" under 4 C.F.R. § 21.1(c)(4). *See* Steven W. Feldman, Government Contract Awards: Negotiation and Sealed Bidding § 31:2 (2007) (noting GAO can decide not to provide notice when protest fails "to state legal and factual grounds for a complaint").

Under § 3554(a)(4) and GAO's implementing regulations, "[t]he Comptroller General may dismiss a protest that the Comptroller General determines is frivolous or which, on its face, does not state a valid basis for protest." *See M.B. Shaw Co.-Reconsideration*, B–247247, 92–1 CPD ¶ 182, 1992 WL 30871 (Comp.Gen. Feb.12, 1992) ("Since Shaw's protest did not on its face state a valid basis for protest, there was no need for us to obtain a report from the agency."); *Beretta USA Corp.-Reconsideration*, B–232681 et al., 89–1 CPD ¶ 16, 1989 WL 240292, at *3 (Comp.Gen. Jan.9, 1989) ("[W]e consistently rely on section 21.3(m) as the basis for dismissing protests which, like Beretta's, lack merit on their face."). GAO thus possesses ample authority to deal with frivolous or facially deficient protests, and the defendant is simply incorrect in predicting a parade of horribles if the Court were to find in favor of the plaintiff.[7] The decision to give notice or utilize the § 3554 dismissal process, however, is entirely within GAO's province.

As for the application of the stay itself, § 3553(d)(3)(A)(ii) provides that once "the Federal agency awarding the contract" receives proper notice of a GAO protest, then "the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." A "protest" is "a written objection by an interested party" to, among other things, the "award or proposed award" of a contract. 31 U.S.C. § 3551(1).

The parties do not dispute that the prerequisites to the application of the automatic stay have been met: (1) GAO has provided (2) timely notice to (3) the "federal agency" (that is, TSA), that (4) a protest (*i.e.*, a written objection to an award) has been filed with GAO. Moreover, GAO has not dismissed the protest as facially deficient or frivolous. Defendant argues, citing no authority, that

---

7. Def.'s Mot. at 14 ("Reading the statutes to include protests not properly before GAO would permit a party that wished to stop performance on a contract for any reason to improperly use the automatic stay provision to do so. Even a party with no interest in the solicitation could file a frivolous protest at GAO, thereby forcing the agency to stay performance and hampering its ability to perform its duties. Such a stay would be inconsistent with the purpose of the automatic stay provision, which is to provide a proper protestor the opportunity to have its protest resolved without the awardee performing on the contract.").

"protest should be read to mean a protest that is properly before GAO." Def.'s Mot. at 14. That is not what the statute says: by its plain terms, when an agency receives notice of a protest filed at GAO the automatic stay kicks in, even if the protest is ultimately determined to be beyond the jurisdiction of GAO. *See, e.g., Meyers Cos., Inc.,* B–275963, 97–1 CPD ¶ 148, 1997 WL 196349 (Comp. Gen. Apr.23, 1997) (noting agency's stay of performance in case ultimately dismissed for lack of jurisdiction).

Defendant and intervenor rely upon five protests of TSA procurements filed at GAO prior to the June 23, 2008 termination of TSA's authority to conduct AMS acquisitions. In each case, GAO properly took jurisdiction of the protest in order to determine its jurisdiction, resulting in a decision dismissing the protest. *Laser Shot, Inc.,* B–310406 (Comp. Gen. Oct. 4, 2007); *Worldwide Recruiters, Inc.,* B–298570 (Comp.Gen. Aug. 8, 2006); *Knowledge Connections, Inc.,* B–298172, 2006 CPD ¶ 67, 2006 WL 1319542 (Comp.Gen. April 12, 2006); *Rimpau Enters.,* B–298463 (Comp.Gen. July 18, 2006); *Seal–It, Inc.,* B–294422 (Comp.Gen. Aug. 25, 2004).

After the conclusion of briefing, the Court asked defendant to report whether performance had continued during the pendency of these five protests at GAO. That is, did the parties treat the CICA stay as applicable to those protests of AMS procurements regardless of GAO's lack of jurisdiction? For four of the five pre–2008 cases, defendant could not ascertain whether performance had continued during the pendency of the protest at GAO.[8] In the fifth case, *Laser Shot,* "[a] stop-work order was issued and remained in place until GAO dismissed the protest. At that point, the stop-work order was cancelled." Def.'s Response to Dec. 10, 2009 Order at 2.

For the four cases where it lacks evidence regarding whether work stopped during the

GAO protest, defendant notes that "when TSA received notice of a protest at GAO over which GAO lacked jurisdiction, it would file a motion to dismiss within ten days of receiving notice of the protest." *Id.* at 2. GAO would then "ordinarily dismiss[ ] the protest within ten days of TSA's motion to dismiss." *Id.* Because only 20 days elapsed between the filing of the protest and GAO's dismissal, "even if contract performance proceeded, very little contract performance actually occurred while the protest was pending." *Id.* at 3. This is consistent with GAO's practice of "promptly dismiss[ing] protests that do not state a valid legal basis or are otherwise procedurally defective, consistent with [their] broad statutory authority." *Report to Congress on Bid Protests Involving Defense Procurements,* B–401197 (Comp.Gen. Apr. 9, 2009). GAO is obliged to consider the "serious potential disruption that protests have on the procurement process," and thus utilizes § 3554 and its regulations to warn protestors that failing to set forth legal and factual grounds for protest will result in a quick dismissal. *The Honorable Eldon Rudd House of Representatives,* B–22061, 1986 WL 65105, at *1 (Comp.Gen. Feb.10, 1986).

In *Laser Shot,* the procurement was conducted entirely under the Federal Supply Schedule and the solicitation did not include any reference to the AMS. Def.'s Mot. at 17. It was therefore not clear that the procurement had been conducted under the AMS, and TSA did not challenge GAO's jurisdiction to entertain the protest. *Id.* TSA issued a stop-work order for the duration of the GAO protest, though GAO ultimately determined that the acquisition was a procurement under the AMS to which CICA did not apply and dismissed the case for lack of jurisdiction. *Id.* That is, TSA treated the CICA stay as applicable where the GAO arguably had jurisdiction. Based upon *Laser Shot* and the initial stop-work order in this case, it does

---

**8.** Defendant responded that for *Seal–It* and *Rimpau,* it had no evidence that a stop work order had been issued (but likewise no evidence that contract performance had continued during the protest). Def.'s Response to Dec. 10, 2009 Order at 1 (docket entry 18, Dec. 15, 2009). *Knowledge Connections* was a pre-award protest that was resolved by GAO prior to the proposal deadline. *Id.* at 2. Defendant could not obtain the file for

*Worldwide Recruiters* and thus could not represent whether a stop-work order had been issued or not. *Id.* Given the summary treatment of these cases, they could have been treated as § 3554(a)(4) dismissals, to which the CICA stay may or may not have applied. Whether a § 3554(a)(4) dismissal is appropriate, however, is a decision for GAO to make.

not appear that TSA has previously taken the position that *TSA* is exempt from CICA and its stay requirement. But that is precisely the effect of the Government's argument here.

Whether an AMS procurement is subject to CICA and whether TSA is subject to CICA are two different questions, as demonstrated by *Laser Shot* and *Resource Consultants, Inc.*, B–290163, 2002 CPD ¶ 94, 2002 WL 1335283 (Comp.Gen. June 7, 2002).[9] The ATSA, which created the TSA, mandates that the AMS "shall apply to acquisitions ... by the Transportation Security Administration." Pub.L. No. 107–71, § 101(n), 115 Stat. at 602. The earlier statute creating the AMS dictates that the CICA (of which 31 U.S.C. § 3553 is a part) "shall not apply to the new acquisition management system developed and implemented" by the FAA. 49 U.S.C. § 40110(d)(2)(E). But this language is directed to the *AMS itself*, not TSA. That is, it does not render *TSA* exempt from following the directive to a "federal agency" contained in § 3553 when a protest of an acquisition conducted under the AMS is filed at GAO. *See Resource Consultants, Inc.*, 2002 WL 1335283, at *3 (TSA is "federal agency" under CICA). It simply renders CICA inapplicable to an AMS acquisition, which in turn leads GAO to dismiss the protest as filed in the wrong forum. The properly presented question in this case is not whether the Phase 2 solicitation is an AMS acquisition, but whether CICA applies to TSA when a protest of the Phase 2 solicitation is filed at GAO. Because TSA is a "federal agency" within the meaning of CICA and the other statutory prerequisites to the application of the automatic stay have been met, the answer is yes.

The parties focus their briefing on such matters as the timing of the termination of TSA's AMS authority, whether Phase 2 is a new "acquisition" within the meaning of the TSA regulation versus a new "solicitation" under the GAO rule, and the terms of the Phase 2 Solicitation language versus the terms of the EAGLE contract. These argu-

ments go to whether GAO possesses merits jurisdiction over the task order—*i.e.*, whether the Phase 2 solicitation is an AMS procurement. As defendant correctly notes, this is not a question within the court's purview. Def.'s Mot. at 14 ("[T]he Court need not directly decide whether GAO possesses jurisdiction, rather, the Court must determine whether the automatic stay provision of 31 U.S.C. § 3553 applies.... As this Court has noted, it lacks authority to directly review GAO's determination of its own jurisdiction."); *see also Centech Group*, 78 Fed.Cl. at 498 n. 6. At minimum, GAO possesses jurisdiction to determine its jurisdiction (*i.e.*, as in the cases cited above). *See, e.g.*, 13D Charles A. Wright et al., FED. PRAC. & PROC. § 3536 (3d ed.2008). When the proper notice is given, the automatic stay applies. Because TSA must comply with the automatic stay provision whether or not the protest is properly filed at GAO, it acted contrary to law in failing to abide by § 3553.

D. *The Court Declares that TSA's Actions Did Not Comply with the Law and Orders TSA to Implement a Stay of Performance Until GAO Resolves the Protest or TSA Makes the Statutorily Required Override Findings*

Where the agency fails to either implement the automatic stay or properly override the stay, this court will undertake the now-familiar four-part analysis to determine whether to grant an injunction enforcing the stay: (1) plaintiff's success on the merits; (2) irreparable injury to plaintiff; (3) balance of hardships; and (4) the public interest. *ES–KO*, 44 Fed.Cl. at 435–36. If the court determines, as it does in this case, that the automatic stay applies, the Government's failure to heed that requirement establishes the protestor's success on the merits. *Id.* at 435. Furthermore, "plaintiff's injury is adequately established by the denial of its right to an automatic stay." *Id.* The third factor to be considered in granting an injunction is the balance of hardships, but the "inclusion of this override exception builds consideration of defendant's potential hardship" into

---

**9.** In *Resource Consultants,* GAO found that it possessed jurisdiction over a protest relating to TSA's procurement of services at a time when

Congress directed TSA to utilize the AMS for its acquisitions of "equipment, supplies, and materials" but not services.

the system. *Id.* at 436. That is, if the defendant concludes it will suffer an undue hardship from the stay, it has a remedy, and that remedy is not to ignore the automatic stay. Thus TSA's decision to ignore the stay results in a balance of hardships favoring plaintiff. The final factor, the public interest, likewise favors plaintiff when the law is simply ignored. *Id.* ("To a large extent, this inquiry too is subsumed within the override exception. . . ."). Congress's policy judgment is that there shall be a stay unless the agency makes the requisite findings. Where there are no findings, then the public interest requires adherence to the law.

Plaintiff has shown entitlement to a declaratory judgment that the CICA automatic stay applies and to an injunction requiring TSA either to comply with the automatic stay provision of § 3553 or seek to make a proper override determination in accord with the terms of that statute.

## CONCLUSION

For the reasons enumerated above, plaintiff's motion for declaratory judgment is **GRANTED,** while defendant's and intervenor's motions are **DENIED.** TSA is **ORDERED** to implement the automatic stay of performance of the ITIP contract until the resolution of the pending protest at GAO or until TSA promulgates a properly supported override determination. The Clerk is directed to enter judgment for plaintiff.

**IT IS SO ORDERED.**